**AMERICAN BITUMULS & ASPHALT CO. et al.**

v.

**UNITED STATES.**

**C. D. 1799; Protest Nos. 191794–K, etc.**

United States Customs Court
First Division.
Aug. 24, 1956.

Sharretts, Paley & Carter, New York City (Joseph F. Donohue, New York City, of counsel), for plaintiffs.

George Cochran Doub, Asst. Atty. Gen. (Richard E. FitzGibbon, Trial Atty.), New York City, for defendant.

Before OLIVER, Chief Judge, and MOLLISON and WILSON, Judges.

MOLLISON, Judge.

This case relates to a number of protests brought by the plaintiffs, as importers of crude petroleum and petroleum fuel oil, alleging the taking of tax or duty at an unlawful rate. All of the merchandise here involved was assessed with tax or duty at the rate of ½ cent per gallon under the provisions of section 3422 of the Internal Revenue Code, 26 U.S.C.A. § 3422. Various Presidential Proclamations were also involved in the assessment, as will appear hereinafter.

As originally filed, the protests claimed that the proper rate of tax or duty assessable on the merchandise was ¼ cent per gallon, and each protest, either as filed or by timely amendment, alternatively claims a rate of ⅜ cent per gallon under section 3422 of the Internal Revenue Code, by virtue of section 350(a), as amended, of the Tariff Act of 1930, 19 U.S.C.A. § 1351(a), and the Presidential Proclamations involved.

The present case has been submitted for decision upon a stipulation of counsel reading as follows:

"It Is Stipulated and Agreed by and between counsel for the parties hereto as follows:

"1. That all of the protests enumerated on Schedule A, annexed hereto and made a part hereof are consolidated and shall be tried together.

"2. That the facts stated on the entry papers covered by each of said

protests, with respect to the rate of tax imposed, the date of entry and the date of liquidation are true and correct and shall be accepted as facts in this case. [Sic.]

"3. That the merchandise covered by said protests consisting of crude petroleum or fuel oil derived from petroleum was assessed with duty at ½% per gallon. The authority relied on for the assessment was the Presidential Proclamation reported in T.D. 52559.

"4. It is not claimed that at the time of importation of the merchandise it was entitled to a lesser rate of duty by virtue of the quota provisions in the Trade Agreement with Venezuela (T.D. 50015). * * *"

The facts and the statutory law applicable show the case to be, in all material respects, similar to that which was decided by a majority of our appellate court in United States v. Metropolitan Petroleum Corp., (Herbert B. Moller) 42 C.C.P.A., Customs, 38, C.A.D. 567, reversing the decision of this court reported as Metropolitan Petroleum Corp. and Herbert B. Moller v. United States, 31 Cust.Ct. 71, C.D. 1547. Defendant urges that the decision in the said case is *stare decisis* of all of the issues presented herein. Plaintiffs, however, urge a new examination of the matter, citing what are claimed to be certain inconsistencies and anomalies in and flowing from the said decision, and certain aspects of the matter not previously explored. Plaintiffs contend that such an examination would lead to substantially different findings and conclusions of law from which a different result would ensue.

When the Metropolitan case was before this court, we set forth in our decision a résumé of the law, including both statutes and amendatory Presidential Proclamations, forming the background for both the assessment and the claims made. On pages 40 and 41 of the report, in volume 42 of the United States Court of Customs and Patent Appeals Reports (Customs), of its decision in that case the majority of our appellate court quoted the said résumé as concisely setting forth the undisputed sequence of events preceding the imposition of the tax in question. As the facts in the case at bar do not call for a different summary, for the sake of brevity, the quoted portion referred to will be adopted and incorporated herein by reference as though fully set out.[1]

There does not seem to be any doubt but that the entire controversy herein revolves about the nature and effect of Presidential Proclamation No. 2901, reported in volume 85 of Treasury Decisions at page 252, and numbered T.D. 52559, 64 Stat. A427. In its decision in the Metropolitan case, the majority of our appellate court succinctly stated the issue in this fashion:

" * * * The determinative question—in fact, the controlling if not only issue in the case—is whether the rate of tax applicable to petroleum products, such as that at bar, was increased beyond the 50 per cent limit laid down by Congress in Section 350, as amended, as a result of the proclamation to which we have herein referred."

After having thus defined the issue, the majority of our appellate court held that the rate of tax applicable to petroleum products had *not* been increased beyond the 50 per centum limit laid down by Congress in section 350, as amended, *as a result of the proclamation.*

In reaching this conclusion, the majority of our appellate court indicated that, in its view, the controlling factor

---

1. It should be noted that section 350(a), as amended, of the Tariff Act of 1930, as in existence at the times of importation here involved, was subsequently further amended by the Trade Agreements Extension Act of 1955, 69 Stat. 162. We are here concerned, however, with the statute as it existed prior to the last-named amendment, i. e., as cited and quoted in the résumé referred to.

was not Proclamation No. 2901 but was the continued existence at all pertinent times of the provisions of the Venezuelan Trade Agreement, 54 Stat. 2375, which it characterized as a "solemn binding document between the two countries."

The court said, among other things—

"* * * We respect, recognize, and sustain the Venezuelan Agreement as being fully effective upon the termination of the Mexican Agreement, regardless of anything that might be inferred to the contrary from what was set forth by the Executive in the terminating proclamation."

From the foregoing, it would appear that our appellate court was applying to the situation and enforcing the provisions of the Venezuelan Trade Agreement *as such* and not the Presidential Proclamation, issued in relation thereto.

The court also quoted with approval from the brief of the appellant before it language embodying the appellant's contention that the Presidential Proclamation issued in 1939 and relating to the Venezuelan Trade Agreement, reported in T.D. 50015, had been superseded when the Mexican Trade Agreement Proclamation (reducing the rate on petroleum, etc.) had gone into effect in 1943, 57 Stat. 833, 909, but that when the Mexican Trade Agreement Proclamation was terminated—

"* * * the rate in the proclamation of the Venezuelan Agreement * * * again became operative with respect to over-quota fuel oil by force of law alone, and it needed no legislative action or proclamation to restore its not defunct but merely dormant rate to effectiveness."

In so holding, our appellate court indicated that it was in entire agreement with the position of the appellant in the case before it that Proclamation No. 2901 was unnecessary to effect any change

of rates and that the act of the President in part IV of the proclamation, proclaiming a rate of ½ cent per gallon on over-quota petroleum and fuel oil, was not a legally effective exercise of Presidential power but was merely declaratory of what had occurred by operation of law, and, presumably, was issued merely for the guidance of administrative officers and others concerned.

Before this court, the Government now relies upon the foregoing expressed in its brief in the Metropolitan case, supra, and has disavowed any support for the view that the trade agreement with Venezuela, and not the proclamation relating thereto, was the controlling factor.

It seems clear that, at least in part, in the view taken by our appellate court, the increase in the rate of duty applicable to overquota petroleum, etc., resulted, not from Proclamation No. 2901, but from the enforcement of the Venezuelan Trade Agreement as municipal or national law of the United States. The implications of this view, with particular reference to the operation of the Trade Agreements Act and its various extensions, we think warrants closer examination of the entire matter.

We believe there can be no doubt but that, by the Trade Agreements Act, both as originally drawn and as amended, it was sought to blend the power of the Executive as the nation's instrument of foreign relations and the power of Congress to regulate commerce and to impose taxes and duties so that the declared purposes of the act should be consummated.[2]

The device of international executive agreements was to be employed in conjunction with the familiar device of delegation to the President of power, by following an intelligible principle and an announcement procedure (proclamation),[3] to change the customs and revenue laws of the United States to meet the chal-

---

2. McClure, Wallace, International Executive Agreements (Columbia University Press, 1941) pp. 186 ff.

3. Field v. Clark, 143 U.S. 649, 680, 12 S. Ct. 495, 36 L.Ed. 294; J. W. Hampton, Jr., & Company v. United States, 276 U.S. 394, 409, 48 S.Ct. 348, 72 L.Ed. 624.

lenge of the world situation which brought the act into being.

The Trade Agreements Act envisions two separate parts to the process, an external part which manifests itself in the agreement between the President, representing the Government of the United States, and the representative or representatives of the governments of other nations, and an internal part, the action taken by the President under legislatively delegated power to effect changes in the customs and revenue laws of the United States. Inasmuch as it appears to be considered that the internal part of the process in the case with which we are here concerned was unnecessary and that the change in the law was effected by or through the external action, we think a discussion of the nature and effect of executive agreements might be helpful.

■ There are at least three types of so-called "executive agreements."[4] The first type is those made with foreign governments under the President's own, independent, constitutional powers. An example of this type of agreement was that which was the subject of United States v. Belmont Executors, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134, involving recognition of foreign governments, a matter solely within the competency of the President. The question as to the effect of such agreements upon constitutional rights and conflicts with acts of Congress has apparently not yet been completely settled, see Seery v. United States, 127 F.Supp. 601, 130 Ct.Cl. 481, and United States v. Guy W. Capps, Inc., 4 Cir., 204 F.2d 655,[5] but is of no materiality in this case, inasmuch as the executive agreements with which we are here concerned were not of this type.

The other two types of executive agreements are (1) those to which effect is not accorded, until approval and implementation is given by the Congress—again, not the type of agreement here involved—and (2) those which are made pursuant to or in accordance with specific direction or authorization by the Congress and having, as their subjects, matters which are particularly within the constitutional powers of Congress.

It is this last type of agreement with which we are here concerned, i. e., one authorized by both houses of Congress under a statutory scheme permitting the President, in effect as the agent of Congress, to alter the tariff rates prescribed by the Congress.

In setting up in section 350 of the Tariff Act of 1930, the statutory machinery to effect the desired purpose, it is clear that Congress followed, in broad outline, the arrangement used in the flexible tariff provisions of the present tariff act, section 336, 19 U.S.C.A. § 1336, and in its predecessor, section 315 of the Tariff Act of 1922. That method of changing tariff rates to meet changing conditions had been tested and found constitutional. J. W. Hampton, Jr., & Company v. United States, 276 U.S. 394, 48 S.Ct. 348, 72 L.Ed. 624.

In its essentials, it required on the part of the Congress the establishing of certain criteria to guide the President and the prescribing of certain limits of change. On the part of the President it required the completion of certain conditions precedent and the use of a proclamation to effect the change in the law.

■ It is not open to doubt that, in the case of the flexible tariff provisions, it is the proclamation of the President which changes the law. The President, acting as the agent of the legislature, proclaims new tariff rates.[6] The proclamation is akin to the legislative act. It is not merely declaratory of a situation

4. See, in this connection, a statement prepared by the Secretariat of the United Nations, approved by the U. S. Department of State, in Laws and Practices Concerning the Conclusion of Treaties, United Nations Legislative Series, 1952, p. 130.

5. The decision in the Capps case was affirmed by the Supreme Court, 348 U.S. 296, 75 S.Ct. 326, 99 L.Ed. 329, on other grounds.

6. Norwegian Nitrogen Products Company v. United States Tariff Commission, 274 U.S. 106, at page 11, 47 S.Ct. 499, 71 L.Ed. 949.

which exists without it—it is the law itself.

As has been said, the use of the device of delegating authority to the President to change tariff rates under an intelligible principle and in accordance with certain conditions and limitations was incorporated into the Trade Agreements Act and into the extensions thereof here involved. Retained as a basic and integral part of the device was the requirement that the President *proclaim* the modifications of duties, restrictions upon imports, or customs or excise treatment of articles covered by foreign trade agreements. The act refers, not to the "agreed" duties and other import restrictions, but to the "proclaimed" duties and other import restrictions, a clear indication that Congress considered the trade agreement to be in the nature of a condition precedent to the issuance of a valid proclamation, *but that the change in the law is effected, not by the trade agreement, but by the proclamation.* By this means, not only is the inherently legislative character of the act preserved, but also the constitutional separation of powers is maintained.

And the situation is the same whether the proclamation be one initiating changes in the law following a trade agreement or one terminating an earlier initiating proclamation. Congress carefully preserved the law-making character of the terminating proclamation by providing that "The President may at any time terminate any such *proclamation* in whole or in part." [Italics added.] Note that it was not provided that the President might terminate any such "agreement" in whole or in part (which would be an act essentially executive in character), but it was provided that he might terminate any such "proclamation" in whole or in part. It is manifest that Congress did not contemplate that the *external* act of the President, in either unilaterally or bilaterally bringing to an end a trade agreement in whole or in part, should, in itself, alter the municipal or national law of the United States with respect to customs and excise taxes or duties. All changes in the laws of the United States were to be wrought by *proclamations,* not *agreements.*

And it is quite clear that this view of the essential character of the proclamation was shared by the President of the United States, who, in Article XIX of the Venezuelan Trade Agreement, agreed that:

"The present Agreement shall be *proclaimed* by the President of the United States of America and shall be ratified by the Government of the United States of Venezuela *in conformity with the laws of the respective countries. * * *"* [Italics added.]

It is to be noted, too, that, in its opening recitals, every proclamation, including those here involved, issued by the President of the United States with respect to trade agreements, states not only that the agreements involved were made—

" * * * pursuant to the authority vested in the President by the Constitution and the statutes, including section 350 of the Tariff Act of 1930, * * *"

but also that the proclamation itself is made under the authority conferred by the said act.

In this connection, see also, in particular, recital No. 7 of Proclamation No. 2901, wherein the President refers to the final sentence of section 350(a) as his authority for the termination of any trade agreement proclamation made under said section 350(a).

We think it is unquestionable that the proclamation of the President is the law-making act contemplated by section 350, supra, and that it is consequently essential to effect any change in the laws of the United States with respect to matters treated in trade agreements. The suggestion that the agreement of the President to initiate or to terminate a trade agreement under authority of section 350, supra, could *ex proprio vigore* establish,

alter, or affect the law of the United States is untenable.[7]

It seems clear, therefore, that, but for the issuance of a proclamation such as Proclamation No. 2901, no change in the rate of tax or duty on the products here involved could have been put into effect.

There are only two parts in the announcement section of Proclamation No. 2901 which have any relation to the taxes or duties leviable upon the products here involved, namely, part I(b) and part IV. Part I(b) proclaims the termination in whole of the earlier proclamations, putting into effect the Mexican Trade Agreement rates, and part IV proclaims specific rates of tax applicable to crude petroleum, topped crude petroleum, and fuel oil derived from petroleum.

In our opinion in the Metropolitan case, we pointed out that we were impressed by the fact that, in part IV of the Proclamation, the President specifically proclaimed the definite rates of tax or duty to be applicable to those products and did not leave room for any assumption or conjecture as to the rates intended to be applied. With respect to part IV of the Proclamation, the defendant has taken the position, as expressed in its brief herein and before our appellate court in the Metropolitan case, as follows:

" * * * In the circumstances, the part of Proclamation No. 2901 which purported to carry out the Venezuelan Agreement and the General Agreement *was redundant,* and it cannot, therefore, be properly considered as having been intended to be a legally effective part of the power exercised by the President *in terminating the Mexican Trade Agreement Proclamation.*" [Italics added.]

The language quoted, particularly when the italicized portions are emphasized, would appear to indicate that the defendant considers part I(b) of the Proclamation, that part terminating the earlier proclamations relating to the Mexican Trade Agreement, to be valid, but that part IV, which, by its terms, purports to carry out the Venezuelan agreement and the general agreement, was redundant, its purpose having been already secured by part I(b) and the original Presidential Proclamation, issued in 1939, in connection with the Venezuelan Trade Agreement. Leaving aside the effect of part I(b) for the moment, we may consider this view of the defendant as to part IV.

■ We are of the opinion that part IV of the Proclamation was *ultra vires,* and consequently void, for the reason that in that portion of the proclamation the President exceeded the powers conferred upon him by the Trade Agreements Extension Act of 1945. We do not think that we may consider that part IV was legally ineffective because it was redundant or unnecessary. Aside from all other considerations, there is a direct bar to such treatment on our part.

In common with proclamations generally, and particularly those issued under authority of section 350 of the Tariff Act of 1930, Proclamation No. 2901 consists of a number of recitals of inducements, followed by the announcements of actions taken predicated upon those inducements. In inducement recital No. 16, the President stated:

"Whereas *I determine that it is required or appropriate* to carry out the said trade agreements specified in the first and twelfth recitals of this proclamation on and after January 1, 1951, that crude petroleum, topped crude petroleum, and fuel oil derived from petroleum, including fuel oil known as gas oil, entered, or withdrawn from warehouse, for consumption in any calendar year in excess of an aggregate quantity of all such products equal to 5 per centum of the total quantity of crude petroleum processed in refineries in continental United States

7. See, in this connection, Senate Document No. 244, 78th Congress, 2d Session, entitled "Treaties and Executive Agreements," particularly at pp. 17–21.

during the preceding calendar year, as provided in said item 3422 set forth in the thirteenth recital of this proclamation shall be subject to import tax at the rate of ½¢ per gallon; * * *." [Italics added.]

This was a determination by the President that it was required or appropriate that certain action be taken. There is no question but that this determination by the President formed the basis for the announcement of his action in part IV of the Proclamation. Save for necessary changes in wording to effect the manifest purpose, both provisions are couched in identical language.

█ It is well settled that the determination of the President in such matters that action by him is required or appropriate is not subject to judicial review. In United States v. George S. Bush & Co., Inc., 310 U.S. 371, at pages 379–380, 60 S.Ct. 944, at pages 946, 84 L.Ed. 1259, a case relating to a Presidential proclamation made under the flexible tariff provisions of the Tariff Act of 1930, the Supreme Court of the United States said:

"* * * And the judgment of the President that on the facts, adduced in pursuance of the procedure prescribed by Congress, a change of rate is necessary is no more subject to judicial review under this statutory scheme than if Congress itself had exercised that judgment. It has long been held that where Congress has authorized a public officer to take some specified legislative action when in his judgment that action is necessary or appropriate to carry out the policy of Congress, the judgment of the officer as to the existence of the facts calling for that action is not subject to review. Martin v. Mott, 12 Wheat. 19, 6 L.Ed. 537; Monongahela Bridge Co. v. United States, 216 U.S. 177, 30 S.Ct. 356, 54 L.Ed. 435; Dakota Central Telephone Co. v. [State of] South Dakota, 250 U.S. 163, 39 S.Ct. 507, 63 L.Ed. 910;

United States v. Chemical Foundation, Inc., 272 U.S. 1, 47 S.Ct. 1, 71 L.Ed. 131. As stated by Mr. Justice Story in Martin v. Mott, supra, 12 Wheat. at pages 31, 32: 'Whenever a statute gives a discretionary power to any person, to be exercised by him upon his own opinion of certain facts, it is a sound rule of construction, that the statute constitutes him the sole and exclusive judge of the existence of those facts.' "

To hold, therefore, as counsel for the defendant would have us do, that the action taken by the President in part IV of the Proclamation was legally ineffective *because unnecessary* would be to hold that it was neither required nor appropriate that he should take action. This we cannot do. The President was the sole judge of whether it was required or appropriate for him to specifically proclaim rates, and he stated in clear and unequivocal terms that it was required or appropriate that such action be taken. We may not review the question of whether it was necessary, required, or appropriate for him to take such action, but we may review, and, indeed, under the issues of this case, must review the question of whether that action was within the limits of the power conferred upon him by the Congress.

By the Trade Agreements Extension Act of 1945, in force and effect on the date of Presidential Proclamation No. 2901, it was explicitly provided that—

"* * * No proclamation shall be made increasing or decreasing by more than 50 per centum any rate of duty, however established, existing on January 1, 1945 (even though temporarily suspended by Act of Congress), or transferring any article between the dutiable and free lists." 59 Stat. 410.

The rate of duty applicable to crude petroleum, topped crude petroleum, and fuel oil derived from petroleum existing on January 1, 1945, was ¼ cent per gallon. By his action in part IV of Proclamation No. 2901, in establishing at ½

cent per gallon the rate of tax or duty applicable to all overquota petroleum and petroleum products, the President decreed an increase over the rate existing on January 1, 1945, of 100 per centum. The President, therefore, failed to keep within the law under which he acted, and his act was *ultra vires* and of no effect. William A. Foster & Co., Inc. v. United States, 20 C.C.P.A., Customs, 15, T.D. 45673. Compare, also, Little v. Barreme, 2 Cranch 170, 6 U.S. 170, 2 L.Ed. 243; Youngstown Sheet & Tube Co. v. Sawyer, 343 U.S. 579, 72 S.Ct. 863, 96 L.Ed. 1153.

It is the contention of the plaintiffs that Proclamation No. 2901, insofar as it relates to the rates applicable to petroleum, etc., must be considered as an entirety and that parts I(*b*) and IV of the proclamation, insofar as they relate to petroleum and petroleum products were interdependent and must stand or fall together. Consequently, plaintiffs argue, to that extent, the invalidity of part IV attaches to and characterizes part I(*b*), the effect being that the rates of duty prescribed by the Mexican Trade Agreement proclamations with respect to petroleum and petroleum products were never legally terminated.

It is to be noted that, save in respect to his actions with respect to petroleum and petroleum products, plaintiffs do not question the right and power of the President to terminate the earlier proclamations relating to the Mexican Trade Agreement, nor the right and power of the President to proclaim adjustments in rates of duty determined by him to be required and appropriate to carry out other trade agreements in view of that termination.

There can be no question but that the proclamation in part IV of specific rates for petroleum and petroleum products was made by the President, *in view of the termination* in part I(*b*) of the earlier Mexican Trade Agreement proclamations, that is to say, the action of proclaiming

the increase was taken because of the action of terminating the earlier proclamations.

It was the view of this court in the Metropolitan case, supra, that the parts of the proclamation, insofar as they relate to petroleum and petroleum products, both in terminating the Mexican Trade Agreement proclamation rate and in establishing the increased rate, were not severable, and that the invalidity of part IV extended to part I(b), so that the ¼ cent per gallon rate established by the Mexican Trade Agreement proclamations was unaffected by Proclamation No. 2901.

It is quite obvious that it is the view of the defendant, and, insofar as the brief of the defendant was quoted by our appellate court in the Metropolitan case, the view of that court, that part I(b) is severable from part IV.

■ The rules of construction with respect to partial invalidity of statutes are applicable to Presidential Proclamations.[8] Crawford, in section 144 of The Construction of Statutes (St. Louis, 1940), gives the following as a test:

"* * * In determining separability, the test is whether the legislature has manifested an intention to deal with a part of the subject matter covered, irrespective of the rest of the subject matter; if such an intention is manifest, the subject matter is separable. If the valid parts are complete in themselves and independent of the invalid parts and capable of being executed according to the intention of the legislature, they must be sustained by the court, notwithstanding partial invalidity."

It must be admitted that, in connection with Proclamation No. 2901, there is nothing at all to show a *manifest* intent on the part of the President to deal with the termination of the earlier Mexican Trade Agreement proclamations insofar as they relate to petroleum and petroleum products independently of the increase in rate to be applied to such commodities.

8.   91 C.J.S., United States, § 30; United States v. Chemical Foundation, Inc., 272 U.S. 1, 13, 47 S.Ct. 1, 71 L.Ed. 131.

Seemingly, one action was taken in the light of the other.

The second sentence quoted above from Crawford, however, seems to offer a slightly different approach. The statement therein contained is similar to a more expanded version contained in the case of Allen v. Louisiana, 103 U.S. 80, 26 L.Ed. 318, in which the Supreme Court said:

"It is an elementary principle that the same statute may be in part constitutional and in part unconstitutional, and that if the parts are wholly independent of each other, that which is constitutional may stand while that which is unconstitutional will be rejected. 'But,' as was said by Chief Justice Shaw, in Warren v. Mayor and Aldermen of Charlestown, 2 Gray 84, Mass., 'if they are so mutually connected with and dependent on each other, as conditions, considerations, or compensations for each other as to warrant a belief that the legislature intended them as a whole, and that, if all could not be carried into effect, the legislature would not pass the residue independently, and some parts are unconstitutional, all the provisions which are thus dependent, conditional, or connected must fall with them.' The point to be determined in all such cases is whether the unconstitutional provisions *are so connected with the general scope of the law as to make it impossible, if they are stricken out, to give effect to what appears to have been the intent of the legislature.*" [Italics added.]

■ These statements indicate that it is requisite to a determination of separability because of partial invalidity that it be possible to give effect to the intent of the legislature without the invalid parts of the law. Applied to the situation at bar, this would require a determination of the question of whether effect could be given to the intent of the legislature if part IV were severed from the Proclamation as invalid. We think that it could.

■ What was the intent of the legislature with respect to the rate which might be imposed on overquota petroleum, etc.? To determine this, we must look not alone to the last prior Presidential Proclamation on the subject, as defendant contends, but to all of the law which has bearing on the matter and which may be indicative to the legislative intent. It must be remembered that, by the Trade Agreements Act, both as originally enacted and as amended, Congress did not surrender jurisdiction over the tariff to the President, but created only an agency which might be exercised under certain conditions, and retained ultimate control, as it was bound to do, in itself.

Defendant's contention herein is based upon the premise that, during the existence of the Presidential Proclamations relating to the Mexican Trade Agreement, the Presidential Proclamation issued in 1939, relating to the Venezuelan Trade Agreement, was in a state of suspension or dormancy. Upon the termination of the proclamations relating to the Mexican Trade Agreement, defendant contends, the proclamation relating to the Venezuelan Trade Agreement (particularly with respect to overquota petroleum, etc.) was restored to full force and effect by operation of law.

The position of the defendant is based upon a concept of "operation of law" in its application to the situation at hand as an automatic return to the 1939 proclamation rate, without any consideration being given to intervening factors. We do not think that the term "operation of law" has such a connotation of blindness to the actual state of the law on the subject.

In its usual signification, the term is generally applicable to matters involving title and refers to situations in which rights, and sometimes liabilities, are created without action by parties. An example is intestacy. The right of the party in whom the estate is vested is not acquired by his act or that of the intestate; it is the effect of the law applicable to situations of intestacy.

It is said also to mean "The obligation of law", 67 C.J.S., p. 505, and the case cited for this reference is United States v. Hammond, 26 Fed.Cas. page 96, 98, No. 15,293, an early case which is source material for many law dictionary definitions and judicial decisions on the subject of operation of law. In that case, the majority of the Circuit Court for the District of Columbia, speaking through Circuit Judge Cranch, observed:

"What then is the operation of a law? A law is always in operation as long as it is the rule of conduct of the subject upon which it is intended to operate; that is, as long as the subject is bound to obey it, or conform his conduct to its provisions. The operation of a law can be nothing more than the obligation of a law. A law ceases to operate when it is no longer obligatory, and as long as it is obligatory it is in full operation. * * *"

"Operation of law" means "its practical working and effect," 67 C.J.S., p. 505, supra, and many of the cases collated under the title "Operation of Law" in 29 Words and Phrases, pages 578–579, and Cumulative Pocket Part, are based upon this meaning. For example, see Miller Jewelry Co. v. Dickson, 111 Ind.App. 676, 42 N.E.2d 398, 403, wherein it was held that a surrender of a lease arises by "operation of law" where the parties do something so inconsistent with the relation of landlord and tenant as to imply that they have both agreed to consider the surrender as made.

■■■ Running through all of the definitions and cases on the subject is a common thread that operation of law means the practical effect of what the law is intended to be on the subject. In the case of the laws of intestacy, it is the fulfillment of the intent of the State that title to property shall always vest in someone who is readily identifiable. In the Hammond case, which involved a question of jurisdiction in a criminal case, it was held to be the intent of the law on the subject that the laws of Virginia should remain in force in the territory (District of Columbia) ceded by that Commonwealth to the Congress as the seat of the Government until Congress framed laws for the Government of the district. In the lease cases, recognition and practical effect were given to the unexpressed intent of the parties.

■■■ To determine the practical effect of the intent of the law on the subject of the rate of duty applicable to overquota petroleum, etc., at the time of importation of the present merchandise, requires a consideration of legislative actions, including both Presidential proclamations and congressional acts, having relation to the subject matter. These are, in effect, statutes in pari materia and must be construed together.

After the suspension, in 1943, by the proclamations relating to the Mexican Trade Agreement, of the rates effectuated in 1939 by the Venezuelan Trade Agreement Proclamation, certain changes took place in the laws of the United States which had their impact upon the suspended Venezuelan Trade Agreement Proclamation.

The first change that took place occurred by virtue of the act of July 5, 1945, 59 Stat. 410, which amended section 350, supra, by tying the 50 per centum limit within which the President might change rates of duty to the rates existing on January 1, 1945, rather than to the rates existing at the time of the passage of the original Trade Agreements Act of 1934, which may be called the "statutory" rates. Congress must be presumed to have known that an increase in duty would be the result of a proclamation terminating an earlier trade agreement proclamation by which an "existing" rate of duty had been reduced. Prior to January 1, 1945, the calculation was based upon "existing," i. e., statutory or 1934, rates of duty. Consequently, for example, if a trade agreement proclamation providing for a 50 per centum decrease of the statutory or 1934 rate of duty were terminated in whole prior to January 1, 1945, the resulting increase would be 50 per centum of the statutory or 1934 rate.

However, on and after January 1, 1945, the rates were tied, not to the statutory

or 1934 rates, but to the rates "existing on January 1, 1945." If both the initial reduction by trade agreement proclamation and the termination occurred after January 1, 1945, the increase resulting from termination in whole would restore the January 1, 1945, rate and be within the 50 per centum limit. But, if the initial reduction had occurred by proclamation prior to January 1, 1945, as in the present case, the increase resulting by termination in whole of that proclamation after January 1, 1945, would be 100 per centum if the pre-1945 rate were restored, and 50 per centum if the January 1, 1945, rate were restored.

Indeed, it would seem that the prohibition against *increasing* duties by more than 50 per centum was as much concerned with the increases which would result from *termination* proclamations, as from initiating proclamations. Note that the President was given power to *modify*, i. e., reduce, existing duties. Further, the stated basis upon which the President was authorized to issue proclamations was to relieve undue burdens and restrictions upon the foreign trade of the United States, and it could scarcely have been contemplated that either this basis or the avowed purposes of the act, as stated in section 350(a), as amended, would have been served by proclamations, based upon foreign trade agreements, *initiating* increases in duties.

The second change that took place was the Presidential Proclamation relating to the General Agreement on Tariffs and Trade, No. 2761A, reported in T.D. 51802, 61 Stat. 1103, which fixed the rate applicable to topped crude petroleum and fuel oil derived from petroleum at ¼ cent per gallon with the following proviso:

> "*Provided,* That in no event shall the rate of import tax applicable under section 3422, Internal Revenue Code, *or any modification thereof, to* topped crude petroleum or fuel oil derived from petroleum be less than the rate of such tax applicable to crude petroleum." 61 Stat. A1346.

While this proclamation did not itself fix a rate of tax applicable to crude petroleum, it tied the rate applicable to the products named to the rate, whatever it might be, which would be in effect during the life of the general agreement proclamation, thus pointing up the need for definiteness and certainty as to the rate which would be applicable. At the time the proclamation relating to the general agreement went into effect, the rate of tax applicable to crude petroleum was ¼ cent per gallon, by virtue of the Mexican Trade Agreement Proclamations, and, consequently, that rate was applicable to topped crude petroleum and fuel oil derived from petroleum. Doubtless it was because of this fact that the President, in recital No. 16 of Proclamation No. 2901, determined that it was required and appropriate to carry out, not only the Venezuelan Trade Agreement, *but also the General Agreement on Tariffs and Trade,* 61 Stat. A3, that crude petroleum should be subject to certain rates.

A consideration of the situation with respect to the tax or duty applicable to overquota crude petroleum, etc., as it existed at the time the Governments of the United States and the United Mexican States agreed that the Mexican Trade Agreement should cease to be effective shows the following: The rates specified in section 3422 of the Internal Revenue Code had been modified by the Presidential proclamation relating to the Venezuelan Trade Agreement, but the effect of that proclamation had been suspended by the proclamations relating to the Mexican Trade Agreement. Presumably, it was desired to put an end to the reduced rates established as United States law by the said proclamations relating to the Mexican Trade Agreement.

Aside from an act of the legislature, the only way this could be accomplished, so far as the law of the United States was concerned, was by means of an instrument such as was used to put the rates into effect, namely, by a proclamation. Not only is this the clear import of the statute, section 350, supra, but it is the means used to effect a tariff change following the termination in whole or in

part of trade agreements to which the United States is a party.[9]

However, it is at once apparent that any proclamation which would be made under the authority of section 350, supra, would be within the limitation laid down in the amendment to section 350 (a) that—

"No proclamation shall be made increasing or decreasing by more than 50 per centum any rate of duty, however established, existing on January 1, 1945 (even though temporarily suspended by Act of Congress), or transferring any article between the dutiable and free lists." 59 Stat. 410.

■ It may be argued that, if part IV of Proclamation No. 2901 were severed from the proclamation, the remainder would not be a proclamation *increasing* a rate of duty, inasmuch as, without part IV, no rate of duty with respect to overquota petroleum, etc., is expressly specified. It is true that with part IV severed, the remainder does not specify in so many words or figures a rate of duty applicable to overquota petroleum, but the language used evinces an intent to limit a *result* and not a *method*. It has been shown, too, that the provisions of the statute, section 350, with respect to increases in rates of duty, are referable to terminating proclamations. The Government's brief correctly points out that a terminating proclamation need not recite every new rate which results from its action.

Moreover, it has been shown that, in order to apply the doctrine of separability to the proclamation, the intent of the legislature must be ascertained and given effect and that no rate could result by operation of law unless it embodied the practical effect of the intent of the legislature. For these reasons, the original Venezuelan Trade Agreement Proclamation, the Trade Agreements Extension Act of 1945, the general agreement proclamation, and Proclamation No. 2901, omitting part IV,

must be considered to be statutes *in pari materia* and construed, not separately, but with reference to each other, so that the resulting rate is as much a product of the proclamation as of the other laws referred to.

So construed, we find the original Venezuelan Trade Agreement proclamation rates applicable to overquota petroleum to have been subject to the operation of the prohibition against increased rates of duty by proclamation of more than 50 per centum of the rates in effect on January 1, 1945, contained in the Trade Agreements Extension Act of 1945; that the general agreement proclamation indicated an intent to make the rate applicable to topped crude petroleum, etc., not less than whatever rate should be in effect during the life of the said general agreement proclamation for crude petroleum; and that Proclamation No. 2901 was, so to speak, the proximate cause of both the termination of the Mexican Trade Agreement rate and the establishment of a new rate as to overquota petroleum, etc.

What was that rate? Obviously, it could not be the original Venezuelan Trade Agreement proclamation rate, because that would be an increase of more than 50 per centum of the rates existing on January 1, 1945. Moreover, in respect to the new rate, inasmuch as it clearly appears that it was the intent of the legislature that the President could not directly proclaim such an increase, it can scarcely be held that it was the intent of the legislature that such increase could be achieved by indirection or inaction. Consequently, it must be held that the Venezuelan Trade Agreement Proclamation rate on overquota petroleum, etc., was restored only to the maximum permitted by the statute, to wit, to the extent of an increase of 50 per centum of $\frac{1}{4}$ cent per gallon, or a total rate of $\frac{3}{8}$ cent per gallon.

■ Not only is this interpretation in harmony and conformity with the laws

9. See terminating proclamations reported in 74 Treas.Dec. 395, T.D. 49824 (Czechoslovakia); 84 id. 345, T.D. 52346 (Columbia); 85 id. 27, T.D. 52399 (Haiti); 85 id. 183, T.D. 52505 (Sweden, Finland, Nicaragua); 85 id. 252, T.D. 52559 (Mexico); 85 id. 295, T.D. 52587 (General Agreement: China); 86 id. 275, T.D.

of the United States as in force and effect at the times here pertinent, but it gives effect thereto, and, furthermore, it does no violence to the external relations of the United States represented by the Venezuelan Trade Agreement. That agreement did not necessarily establish a rate of ½ cent per gallon upon over-quota petroleum, etc. Article II of the said agreement, as reported in T.D. 50015, provided that such articles should, on their importation into the United States of America, be exempt from customs and other duties *in excess* of those set forth and provided for in the said agreement. Item 3422 of schedule II of the agreement specified that the rate on overquota petroleum, etc., "shall not exceed" ½ cent per gallon. In other words, the agreement bound the United States not to impose duties in excess of ½ cent per gallon, but did not constitute a barrier to the imposition of duties of *less* than ½ cent per gallon.

The claim in plaintiffs' protests, either as originally filed or as amended, for assessment of the petroleum at bar at ⅜ cent per gallon is, therefore, sustained. In all other respects and as to all other claims, the said protests are overruled.

Judgment will issue accordingly.

52770 (Costa Rica); 86 id. 360, T.D. 52838 (Peru); 86 id. 408, T.D. 52874

(General Agreement: China); and 89 id. 103, T.D. 53496 (Uruguay).