**ROHNER, GEHRIG & COMPANY, et al.,**
**Plaintiffs-Appellees,**

v.

**CAPITAL CITY BANK,**
**Defendant-Appellant.**

**No. 79–3297.**

United States Court of Appeals,
Fifth Circuit.
Unit B

Sept. 8, 1981.

Ronald W. Rogers, Atlanta, Ga., for defendant-appellant.

Sutherland, Asbill & Brennan, Carey P. DeDeyn, John W. Bonds, Jr., Atlanta, Ga., for plaintiffs-appellees.

Before SIMPSON, RONEY and THOMAS A. CLARK, Circuit Judges.

SIMPSON, Circuit Judge:

In this diversity case, Capital City Bank (the Bank), defendant below, appeals from an adverse jury verdict and judgment for $60,000 plus interest, in favor of the appellees, plaintiffs below, Rohner, Gehrig & Company (Rohner, Gehrig), Panalpina International Forwarding, Ltd. of Milano (Panalpina Milano) and Panalpina World Transport, Ltd., Hamburg (Panalpina Hamburg). The District Court granted a directed verdict upon the conclusion of defendants' case as to Panalpina International

Forwarding, Ltd., a New York corporation (Panalpina New York) because the evidence showed that its claim was for less than the $10,000 jurisdictional amount. This appeal followed the trial court's denial of the Bank's motion for judgment notwithstanding the verdict or for a new trial. We affirm.

The facts essential to an understanding of the setting of this case include a description of the parties and the situation in which those parties became embroiled. The Capital City Bank is a small Atlanta bank with one main office and a branch employing about thirty people. In this matter, it was the depositary bank.

The appellees, Rohner, Gehrig, Panalpina Milano, Panalpina Hamburg, and Panalpina New York were engaged in the international freight-forwarding business. Rohner, Gehrig arranged the most economical means of exporting goods from the United States to Europe; whereas, the Panalpina network of companies planned the flow of goods from Europe to the United States. Emil Zurcher was the president of Rohner, Gehrig from 1963 through the date of trial and owned 79% of the company's stock at the date of trial and was also the president of Panalpina.

An agreement of mutual cooperation existed between Panalpina World Transport, Ltd., a Swiss corporation and parent company of the Panalpina organization, and Rohner, Gehrig. Under this agreement, Rohner, Gehrig provided office space in its United States offices and reimbursement of business expenses for sales representatives of the Panalpina organization who were to solicit increased business for the Panalpina companies. Because of treaty requirements and visa restrictions, these sales representatives were formally employed by United States subsidiaries of the European Panalpina companies, although the employees' remuneration and management came from the European parent company. Panalpina New York was organized as a United States entity to which European sales representatives working out of Rohner, Gehrig offices could be attached for treaty compliance

purposes and had no active existence of its own. During this action, Rohner, Gehrig had an Atlanta office primarily to provide office space for a European Panalpina sales representative. This lawsuit arose out of misappropriation of checks by one sales representative, Erwin Grabenweger, who misused an account Rohner, Gehrig maintained with the Bank.

The history of this imbroglio began before Grabenweger's employment, when Henri Ferrier was assigned to the Atlanta office as the Panalpina sales representative. Ferrier opened a personal checking account at the Bank; and Frank Castellow, an officer of the Bank, formed an impression that Ferrier was the head man of Panalpina, which Castellow assumed to be a small Atlanta freight-forwarding company.

Because the United States sales activity of Panalpina involved only the solicitation of freight-forwarding contracts between United States customers and appropriate European Panalpina freight forwarders, Panalpina New York did not have either financial transactions or active bank accounts. To cover office expenses of the Atlanta sales representation activity a petty cash account was opened in Rohner, Gehrig's name with the Bank in May of 1973. The account, opened with an initial deposit of $2,000, was dormant until the start of the fraudulent activity which formed the basis of this action. Personnel of the Bank were unaware of the limited purpose of the account and assumed that the account was a general checking account.

Ferrier, the only nonsecretarial person in the Atlanta office, was given authority on the Bank's signature card as office manager to draw checks on the account. The company's president and district manager were also given authority on this signature card. Also, the Rohner, Gehrig corporate resolutions provided to the Bank indicate that all drafts, checks, etc. could be signed singly by the President, Controller, District Manager or Office Manager.

In the fall of 1973, Erwin Grabenweger, a twenty-three year old Austrian, was assigned to the Atlanta area to replace Ferri-

er as the Panalpina sales representative. According to Castellow's testimony, Ferrier introduced Grabenweger to him at the Bank as a "trusted employee of Panalpina" who would succeed Ferrier as head man of Panalpina and office manager for Rohner, Gehrig.

In October of 1974, after Ferrier's departure, Grabenweger became office manager of the Rohner, Gehrig office and was given authority to sign checks on the Rohner, Gehrig account. A new signature card was made showing the President and Treasurer, Controller, District Manager and Office Manager had authority to sign checks.

In June of 1974, before Ferrier's departure and before Grabenweger was given authority with respect to the petty cash account, Grabenweger presented for deposit to the Rohner, Gehrig account a $3,545.60 check payable to Panalpina International Forwarding, Ltd. and indorsed in blank by means of a rubber stamped impression in that name. The teller, questioning whether such a check should be accepted for deposit, brought it to Castellow's attention. Based on his impression that Grabenweger was head man of Panalpina and his representation that he had affixed the stamped indorsement himself and was authorized to do so, Castellow directed the teller to accept not only the check, but all subsequent Panalpina checks so indorsed by Grabenweger.

Over the subsequent one year period, Grabenweger deposited into the Rohner, Gehrig account at least 24 checks payable to the Panalpina name, representing more than $130,000 in payments due Panalpina Milano and Panalpina Hamburg for freight-forwarding services. Some of these checks were altered to add Rohner, Gehrig as a payee and all (except a few with no indorsements at all) bore the rubber-stamped Panalpina indorsement.

Over the same period, Grabenweger drew some checks which he then exchanged for Bank instruments payable to an appropriate European Panalpina company, in an effort to disguise his fraud as simply a slow pay problem on the part of that company's United States customers. Most of the proceeds, however, were withdrawn from the account by Grabenweger for his own use and benefit. After the fraud was discovered and criminal prosecution was imminent, Grabenweger took his own life.

Following Rohner, Gehrig's discovery of the misappropriation and ascertainment by Panalpina Milano and Panalpina Hamburg of the amounts of their apparent losses, Rohner, Gehrig paid those companies the principal amounts of their determined losses in exchange for their rights against the Bank.

Rohner, Gehrig successfully asserted those rights in the course of the litigation below.

The appeal presents the following issues:

1. Whether the trial court's denial of the Bank's breach-of-warranty defense to the conversion claims brought by Rohner, Gehrig as subrogee was reversible error in light of the District Court's previous ruling that the Bank's attempt to add the same contentions as a counterclaim was untimely?

2. Whether the trial court's ruling allowing plaintiffs Panalpina Milano and Panalpina Hamburg, as subrogors of the claims asserted against the Bank to remain as parties to the action constituted reversible error?

3. Whether the trial court's instruction on apparent authority was reversible error?

Consideration of the first question raised, whether the trial court's denial of the Bank's breach-of-warranty defense to the conversion claims brought by Rohner-Gehrig as subrogee was reversible error, requires a statement of the procedural development of the case.

The complaint was filed February 19, 1976, timely responded to by answer and an amendment to the answer. Denial of the Bank's motion for summary judgment was followed by a pretrial conference, all by August 30, 1978.

Following a second scheduled pretrial conference on January 3, 1979, the Bank moved for leave to amend its answer to add

a counterclaim asserting that Rohner, Gehrig was liable for breach-of-warranty under Georgia Code Annotated § 109A–3—417 and § 109A–4—207.[1]  By order dated Feb-

1.    **109A–3—417 Warranties on presentment and transfer**

(1) Any person who obtains payment or acceptance and any prior transferor warrants to a person who in good faith pays or accepts that

(a) he has a good title to the instrument or is authorized to obtain payment or acceptance on behalf of one who has a good title; and

(b) he has no knowledge that the signature of the maker or drawer is unauthorized, except that this warranty is not given by a holder in due course acting in good faith

(i) to a maker with respect to the maker's own signature; or

(ii) to a drawer with respect to the drawer's own signature, whether or not the drawer is also the drawee; or

(iii) to an acceptor of a draft if the holder in due course took the draft after the acceptance or obtained the acceptance without knowledge that the drawer's signature was unauthorized; and

(c) the instrument has not been materially altered, except that this warranty is not given by a holder in due course acting in good faith

(i) to the maker of a note; or

(ii) to the drawer of a draft whether or not the drawer is also the drawee; or

(iii) to the acceptor of a draft with respect to an alteration made prior to the acceptance if the holder in due course took the draft after the acceptance, even though the acceptance provided "payable as originally drawn" or equivalent terms; or

(iv) to the acceptor of a draft with respect to an alteration made after the acceptance.

(2) Any person who transfers an instrument and receives consideration warrants to his transferee and if the transfer is by indorsement to any subsequent holder who takes the instrument in good faith that

(a) he has a good title to the instrument or is authorized to obtain payment or acceptance on behalf of one who has a good title and the transfer is otherwise rightful; and

(b) all signatures are genuine or authorized; and

(c) the instrument has not been materially altered; and

(d) no defense of any party is good against him; and

(e) he has no knowledge of any insolvency proceeding instituted with respect to the maker or acceptor or the drawer of an unaccepted instrument.

(3) By transferring "without recourse" the transferor limits the obligation stated in subsection (2)(d) to a warranty that he has no knowledge of such a defense.

(4) A selling agent or broker who does not disclose the fact that he is acting only as such gives the warranties provided in this section, but if he makes such disclosure warrants only his good faith and authority.

(Acts 1962, pp. 156, 263.)

**109A–4—207 Warranties of customer and collecting bank on transfer or presentment of items;  time for claims**

(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that

(a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; and

(b) he has no knowledge that the signature of the maker or drawer is unauthorized, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith

(i) to a maker with respect to the maker's own signature; or

(ii) to a drawer with respect to the drawer's own signature, whether or not the drawer is also the drawee; or

(iii) to an acceptor of an item if the holder in due course took the item after the acceptance or obtained the acceptance without knowledge that the drawer's signature was unauthorized; and

(c) the item has not been materially altered, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith

(i) to the maker of a note; or

(ii) to the drawer of a draft whether or not the drawer is also the drawee; or

(iii) to the acceptor of an item with respect to an alteration made prior to the acceptance if the holder in due course took the item after the acceptance, even though the acceptance provided "payable as originally drawn" or equivalent terms; or

(iv) to the acceptor of an item with respect to an alteration made after the acceptance.

(2) Each customer and collecting bank who transfers an item and receives a settlement or other consideration for it warrants to his transferee and to any subsequent collecting bank who takes the item in good faith that

(a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title and the transfer is otherwise rightful; and

(b) all signatures are genuine or authorized; and

(c) the item has not been materially altered; and

(d) no defense of any party is good against him; and

(e) he has no knowledge of any insolvency proceeding instituted with respect to the

ruary 16, 1979, the trial court denied the Bank's motion as inexcusably untimely. The case proceeded to trial.

On the second day of the trial, the Bank, by filing its requests to charge numbers 13 and 14, attempted to raise Rohner-Gehrig's breach-of-warranty as a defense. The jury instructions requested by the Bank were not used by the District Judge in his charge to the jury, to which the Bank excepted. Breach-of-warranty was also argued by the defendant in its motion for judgment notwithstanding the verdict or in the alternative for a new trial, which was denied.

■ The applicable law is clear. The appellant raised the 4—207 warranties for the first time by the assertion of a counterclaim which the District Court denied as inexcusably untimely under Federal Rule of Civil Procedure 13(f). The pertinent rule of law is that the decision to allow a counterclaim to be pleaded is a matter of judicial discretion and may be reversed on appeal only if the party can demonstrate that the court abused its discretion. 6 Wright & Miller, Federal Practice and Procedure: Civil § 1430, at 155 (1971). *See T. J. Stevenson & Co., Inc. v. 81,193 Bags of Flour*, 629 F.2d 338, 370 (5th Cir. 1980); *Imperial Enterprises, Inc. v. Fireman's Fund Insurance Co.*, 535 F.2d 287, 293 (5th Cir. 1976), *reh. denied*, 540 F.2d 1085 (5th Cir. 1976); *Ralston-Purina Co. v. Bertie*, 541 F.2d 1363, 1367 (9th Cir. 1976).

■ Based on the carefully set forth reasons contained in the trial court's order dated February 16, 1979, we find that the trial judge did not abuse his discretion in holding that the Rule 13(f) motion for leave to add an omitted counterclaim was inexcusably untimely in the instant case. In this order, the court gave three reasons reinforced by citations to proper authority: (1) the opposing party would be prejudiced; (2) the trial court would have to undergo additional strain on its already overcrowded docket and (3) the defendant's reason for the delay was simply that he overlooked the possibility of the counterclaim; and that although the standard is "oversight, inadvertence, or excusable neglect", Rule 13(f) does not give a party the privilege of totally neglecting its case and ignoring time limitations imposed by the Federal Rules of Civil Procedure even absent bad faith or dilatory motive on its part. All of these reasons are valid and justify the judicial discretion exercised in this case.

The Bank, as appellant in our court, has reasserted the merits of its 4—207 claim. Two issues of Georgia law, poorly stated in the appellant's brief, would require decision if the merits of the 4—207 claim are to be resolved. They are: (1) Whether the fact that Rohner, Gehrig was making its claims as a subrogee of the true owner and not as the customer of the Bank, affects the Bank's liability under the Uniform Code, and (2) whether the warranty provisions of 4—207 absolve the Bank of its obligation of inquiry under the facts of this case. Because we have found in this case that the trial judge did not abuse his discretion in finding that 4—207 was not raised in a timely manner we decline to decide these issues. *See Walker v. Sinclair Refining Company*, 320 F.2d 302, 305 (3rd Cir. 1963) (en banc).

maker or acceptor or the drawer of an unaccepted item.

In addition each customer and collecting bank so transferring an item and receiving a settlement or other consideration engages that upon dishonor and any necessary notice of dishonor and protest he will take up the item.

(3) The warranties and the engagement to honor set forth in the two preceding subsections arise notwithstanding the absence of indorsement or words of guaranty or warranty in the transfer or presentment and a collecting bank remains liable for their breach despite remittance to its transferor. Damages for breach of such warranties or engagement to honor shall not exceed the consideration received by the customer or collecting bank responsible plus finance charges and expenses related to the item, if any.

(4) Unless a claim for breach of warranty under this section is made within a reasonable time after the person claiming learns of the breach, the person liable is discharged to the extent of any loss caused by the delay in making claim.

(Acts 1962, pp. 156, 292.)

Although the Bank does not argue that the trial judge abused his discretion in finding its motion to add the counterclaim untimely under Rule 13(f) nor state precisely on what theory under the Rules of Civil Procedure it wishes us to consider its 4—207 claim, it does object to the trial court's refusal to instruct on 4—207 apparently as a misstatement or omission of the law in this case. No need exists for an instruction, however, on an issue not presented by the pleadings nor effectively raised at the trial. 9 Wright & Miller, Federal Practice and Procedure: Civil § 2556, at 662. The instant case is somewhat analogous to *Radio Corporation of America v. Radio Station KYFM, Inc.*, 424 F.2d 14, 17 (10th Cir. 1970), which stated, "It is axiomatic that the failure of a party to effectively raise an affirmative defense precludes any requirement that the Trial Judge present such issue to the jury by an instruction." While this case does not present an ineffectively or improperly raised affirmative defense, the same principle applies. The failure of the Bank timely to assert its counterclaim precluded any requirement that the trial judge instruct the jury on that issue.

The Bank further contends here that "Rohner, Gehrig, as a customer of Capital City Bank, warranted to Capital City Bank by operation of law as to all checks deposited to its checking account with the Bank by its employee Erwin Grabenweger: (1) that Rohner, Gehrig had good title; (2) that there were no alterations on the faces of those items; and (3) that Rohner, Gehrig would bear any loss suffered by the Bank or the true owners of such items if such warranties proved untrue." As gleaned from its brief, the Bank's argument in essence makes two assertions: (1) the 4—207 warranties arise by "operation of law"; therefore, they can not be cut off and may be raised at any time during trial or on appeal; and (2) the 4—207 warranties entitle the Bank to pass the loss on a forged endorsement to its customer as a matter of law. Both propositions are specious.

First, "arising by operation of law" is not precise terminology, although not incorrect in a colloquial sense. In its usual significance, the definition of "situations arising by operation of law" is situations in which rights, and sometimes liabilities, are created without action by the parties. *American Bitumuls & Asphalt Co. v. United States*, 146 F.Supp. 703, 713 (U.S.Cust.Ct.1956). The Uniform Commercial Code does not use the term "arising by operation of law." [2] The draftsmen's comments to 4—207, which are not a part of the Georgia Code, however, state that "The warranties and engagements arise *automatically* as a part of the bank collection process." Uniform Commercial Reporting Service, Uniform Commercial Code Sec. 4—207, ¶ 4—207 (Pike and Fischer, Inc. 1977) (emphasis added). In the case of the 4—207 warranties, it is preferable and less misleading to say that they arise "automatically" as opposed to "by operation of law." Regardless, the mere fact that these warranties arise either automatically or by operation of law does not mean that they can not be cut off by failure to assert them in a timely manner as happened in this case.

In support of its second argument, that as between the depositary bank and its customer, 4—207 entitles the Bank to recover as a matter of law, the Bank cites *Kelton Motors, Inc. v. The Phoenix of Hartford Ins. Co.*, 522 F.2d 728 (2nd Cir. 1975). The *Kelton* situation is distinguishable from the instant facts. In *Kelton*, the customer of the depositary bank was a partnership consisting of two brothers. One brother, Willard, forged an indorsement and gave the check to his brother, Leon, to deposit into the partnership account. In reversing the District Court, which found that the wrongful act of Willard was not committed in the course of partnership business, the Second Circuit in a per curiam opinion found that Leon as a member of the partnership was liable for the partnership debts and that the partnership debt arose from its breach of warranty to the depositary bank. *Id.* at

2. The Encyclopedia of Georgia law says only that the 4—207 warranties "arise even without endorsement ..." 4 Encyclopedia of Georgia Law § 224 at 260 (1978).

729. The appellate court stated, "That warranty was a partnership warranty and a member of the partnership cannot escape liability even if some of the partners did not participate in the swindle." *Id.* The controlling difference between *Kelton* and this case is that *Kelton* involved two brothers in a partnership, not a corporation and an employee as here. In *Kelton,* the partner depositing the check for his dishonest brother-partner, the forger, was in a better position to detect the forgery than was the depository bank. Furthermore, in *Kelton,* 4—207 was pled and proved in a timely manner.

■ Breach of the 4—207 warranties, even when properly pled, does not per se entitle the depositary bank to judgment over its customer. *See National Bank of Georgia v. Refrigerated Transport Co. Inc.,* 147 Ga.App. 240, 248 S.E.2d 496, 500 (1978). Indeed, both 3—419 as well as 4—207 are written in positive, absolute liability terms; however, when they are argued in an actual case, liability depends on the facts and the law involved in the case as a whole. *Cf. First Bank & Trust Co. v. Insurance Service Association, Inc.,* 154 Ga.App. 697, 269 S.E.2d 527, 30 U.C.C. 261 (1980). The Washington Court of Appeals expressed the scheme under the Uniform Commercial Code in the following manner:

the recovery by the drawee bank from the collecting bank, and the judgment in favor of the collecting bank against the forger is the progression foreseen by the Uniform Commercial Code. Rights of recovery continue until the party taking the check from the forger is reached. If recovery from the forger is precluded by the forger's unavailability or insolvency, the party dealing directly with the forger should bear the loss. The rationale of the Uniform Commercial Code solution is persuasive, for the party taking the check from the forger is in the best position to prevent the forgery and avoid consequent losses. H. Bailey, The Law of Bank Checks §§ 15.10, 15.13 (4th ed. 1969).

Notwithstanding the foregoing discussion, losses should not be placed upon negligent banks simply because it is a convenient solution to do so or when such action will grant an unwarranted and unearned benefit upon another. The situation must be considered in the light of general principles of law and equity which supplement the provisions of the Uniform Commercial Code. RCW 62A.1–103.

*Bank of the West v. Wes. Con Development Co., Inc.,* 15 Wash.App. 238, 548 P.2d 563, 19 U.C.C. 593, 597 (1976). In this case, if 4—207 had been timely raised, the District Court and jury would have had to resolve the two issues of Georgia law set forth above in accordance with the underlying scheme and policy considerations of the Uniform Commercial Code as enacted in Georgia.

Unlike the first issue of timeliness, the law involved in resolving the second issue, which is whether the trial court's ruling allowing plaintiffs Panalpina Milano and Panalpina Hamburg, as subrogors of the claims asserted to remain as parties to the action constituted reversible error, is complicated by a conflict of laws problem. But the facts as to this issue of civil procedure are simple. At the close of plaintiffs' case, the court denied the Bank's motion for a directed verdict as to the Panalpina plaintiffs, on the grounds that they had been paid for their losses and had assigned their claims.

Two letters from Rohner, Gehrig to Panalpina Milano and Panalpina Hamburg were received in evidence. On these letters, by signature both Panalpina corporations agreed to "subrogate your (Panalpina company's) claim to ours (Rohner, Gehrig's), and remit to us any amount which you may recover not in excess of our payment to you." These subrogation agreements were signed by the Panalpina plaintiffs and mailed to New York where they were received by Rohner, Gehrig.

■ The law in diversity actions involving conflict of laws problems is that the substantive legal issues must be resolved by the forum state's conflict of laws rules. *Maryland Cas. Co. v. Williams,* 377 F.2d 389,

392 (5th Cir. 1967). Georgia is the forum state in the instant case and the conflicts rule in Georgia is that where a contract is made and is to be performed in another state, the laws of the latter state will govern as to the validity, nature, obligation and construction of the contract, where they are duly pled and proved, and such laws will be enforced by comity in Georgia unless they are contrary to public policy or prejudicial to the interests of Georgia. *See Goodman v. Nadler*, 113 Ga.App. 493, 148 S.E.2d 480, 482 (1966). The contract involved here was both made and performed in New York; therefore, New York law governs the substantive matters.

■ Under New York law, as well as the law of other jurisdictions, a subrogation agreement is equivalent to an assignment. *Sisson v. Hassett*, 280 N.Y.S. 148, 155 Misc. 667 (1935); *Harrell v. Carlton*, 141 Ga.App. 41, 232 S.E.2d 384, 385 (1977). *See also* 73 Am.Jur.2d, Subrogation, § 4 (1974); 6 Wright & Miller, Federal Practice and Procedure: Civil § 1546 (1971). Moreover, partial subrogation rights parallel the rights of partial assignment. 6 Wright & Miller, Federal Practice and Procedure: Civil § 1546 (1971).

■ Also, under New York law, when a part of a cause of action has been assigned or subrogated, the partial owners are real parties in interest to the extent of their claim. *See Sisson v. Hassett*, 280 N.Y.S. 148, 155 Misc. 667 (1935). *See also, Texas San Juan Oil Corp. v. An-Son Offshore Drilling Co.*, 194 F.Supp. 396, 397 (S.D.N.Y. 1961). We hold accordingly that based on the relevant law, under the subrogation agreement in question, both the subrogor and subrogee were real parties in interest and the trial judge was not in error.

Our holding is supported by the weight of authority. Williston classifies the assignment (subrogation agreement) in question as being of the type in which an intention is manifested that the assignee shall enforce the entire claim against the debtor and, having done so, shall retain part for himself and turn over the remainder to the assignor. 3 Williston On Contracts § 441 (3rd ed. 1960). Concerning these partial assignments for collection Williston says:

> There is in effect a total assignment, so far as the collection of the claim is concerned. The assignee is dominus of the whole claim and becomes trustee of a portion of the proceeds after collection. What has been said already in regard to assignments of an entire claim is applicable to such cases, except that if all persons interested are parties to a suit to collect the claim, the assignee's recovery will be limited to the amount which he is equitably entitled to keep.

*Id.* Corpus Juris Secundum also discusses this type of assignment and declares:

> [T]he assignor may sue where he retains a beneficial interest in the chose in action assigned, as where the assignment is for security, or for collection, although it has been held that the fact that the assignor has guaranteed collection of an assigned claim will not permit him to sue thereon.

6A C.J.S. Assignments § 104. Finally, on assignments for collection, see Wright & Miller: "Thus in an action involving an assignment for collection, which was referred to earlier, or an assignment for security, the assignor retains a sufficient interest in the property to be a real party in interest, and under Rule 17(a) either party may sue to protect his rights." 6 Wright & Miller, Federal Practice and Procedure: Civil § 1545 (1971).

The third issue, whether the trial court's instruction on apparent authority was reversible error, requires a look at the charge as given and examination of it in the light of federal procedural law and the pertinent substantive law of Georgia. In part, the trial court gave the following jury instructions on apparent authority:

> In this connection, I charge you that if the bank shows by a preponderance of the evidence that it dealt with the checks in good faith and in accordance with reasonable commercial standards applicable to the banking business, then it would not be liable to the plaintiffs for the amount of the checks deposited over the forged endorsements.

Good faith means honesty in fact in the transaction concerned, that is, whether one acted in good faith depends on that person's subjective intent.

In deciding whether the bank acted in accordance with reasonable commercial standards applicable to the banking business, you may consider whether Grabenweger had apparent authority to endorse the checks on behalf of Panalpina, that is, you may consider whether Panalpina had placed Grabenweger in such a situation that a bank, acting with ordinary prudence and familiar with the business usages and nature of the business involved, was justified in assuming that Grabenweger had the authority to endorse the checks and that the bank did in fact deal with Grabenweger on that assumption.

The trial judge has wide discretion permitting him to select his own words and to charge in his own style. *Bass v. International Broth. of Boilermakers*, 630 F.2d 1058, 1061 (5th Cir. 1980). The function of the reviewing court with respect to instructions is to satisfy itself that the instructions show no tendency to confuse or to mislead the jury with respect to the applicable principles of law. 9 Wright & Miller, Federal Practice and Procedure: Civil § 2558. *See Delancey v. Motichek Towing Service, Inc.*, 427 F.2d 897, 901 (5th Cir. 1970). In reviewing the claim of error, we evaluate the substance of the charge under the law of Georgia. *Kroger Co. v. Roadrunner Transp. Inc.*, 634 F.2d 228 (5th Cir. 1981).

The part of the charge objected to at trial is supported by two Georgia cases, *National Bank of Georgia v. Refrigerated Transport*, 147 Ga.App. 240, 248 S.E.2d 496 (1978) and *General Acceptance Corp. v. Guintini*, 115 Ga.App. 723, 155 S.E.2d 722 (1967), and the Uniform Commercial Code. Concerning apparent authority the *General Acceptance Corporation* case states:

> Where a principal has "placed an agent in such a situation that a person of ordinary prudence conversant with business usages and the nature of the particular business is justified in assuming that such agent has authority to perform a particular act

and deals with the agent upon that assumption, the principal is estopped as against such third person from denying the agent's authority; he will not be permitted to prove that the agent's authority was, in fact, less extensive than that with which he apparently was clothed."

*General Acceptance Corporation v. Guintini, supra*, 155 S.E.2d at 723. We conclude that the instruction objected to in this case is not erroneous because it is not misleading and it reflects the pertinent substantive law of Georgia.

We thus determine all three issues on appeal to be without merit.

AFFIRMED.