6 U.S. 170 (1804)
2 Cranch 170
LITTLE ET AL.
v.
BARREME ET AL.
Supreme Court of United States.
February 27, 1804.
*176 The cause was argued at December term 1801, by Dexter for the appellants, and by Martin and Mason for the claimants.
MARSHALL, Chief Justice, now delivered the opinion of the Court.
The Flying-Fish a Danish vessel having on board Danish and neutral property, was captured on the 2d of December 1799, on a voyage from Jeremie to St. Thomas's, by the United States frigate Boston, commanded by Captain Little, and brought into the port of Boston, where she was libelled as an American vessel that had violated the non-intercourse law.
The judge before whom the cause was tried, directed a restoration of the vessel and cargo as neutral property, but refused to award damages for the capture and detention, because in his opinion, there was probable cause to suspect the vessel to be American.
On an appeal to the circuit court this sentence was reversed, because the Flying-Fish was on a voyage from, not to, a French port, and was therefore, had she even been an American vessel, not liable to capture on the high seas.
*177 During the hostilities between the United States and France, an act for the suspension of all intercourse between the two nations was annually passed. That under which the Flying-Fish was condemned, declared every vessel, owned, hired or employed wholly or in part by an American, which should be employed in any traffic or commerce with or for any person resident within the jurisdiction or under the authority of the French republic, to be forfeited together with her cargo; the one half to accrue to the United States, and the other to any person or persons, citizens of the United States, who will inform and prosecute for the same.
The 5th section of this act authorises the president of the United States, to instruct the commanders of armed vessels, "to stop and examine any ship or vessel of the United States on the high sea, which there may be reason to suspect to be engaged in any traffic or commerce contrary to the true tenor of the act, and if upon examination it should appear that such ship or vessel is bound or sailing to any port or place within the territory of the French republic or her dependencies, it is rendered lawful to seize such vessel, and send her into the United States for adjudication.
It is by no means clear that the president of the United States whose high duty it is to "take care that the laws be faithfully executed," and who is commander in chief of the armies and navies of the United States, might not, without any special authority for that purpose, in the then existing state of things, have empowered the officers commanding the armed vessels of the United States, to seize and send into port for adjudication, American vessels which were forfeited by being engaged in this illicit commerce. But when it is observed that the general clause of the first section of the "act, which declares that such vessels may be seized, and may be prosecuted in any district or circuit court, which shall be holden within or for the district where the seizure shall be made," obviously contemplates a seizure within the United States; and that the 5th section gives a special authority to seize on the high seas, and limits that authority to the seizure of vessels bound or sailing to a French port, the legislature seem to have prescribed *178 that the manner in which this law shall be carried into execution, was to exclude a seizure of any vessel not bound to a French port. Of consequence, however strong the circumstances might be, which induced captain Little to suspect the Flying-Fish to be an American vessel, they could not excuse the detention of her, since he would not have been authorised to detain her had she been really American.
It was so obvious, that if only vessels sailing to a French port could be seized on the high seas, that the law would be very often evaded, that this act of congress appears to have received a different construction from the executive of the United States; a construction much better calculated to give it effect.
A copy of this act was transmitted by the secretary of the navy, to the captains of the armed vessels, who were ordered to consider the 5th section as a part of their instructions. The same letter contained the following clause. "A proper discharge of the important duties enjoined on you, arising out of this act, will require the exercise of a sound and an impartial judgment. You are not only to do all that in you lies, to prevent all intercourse, whether direct or circuitous, between the ports of the United States, and those of France or her dependencies, where the vessels are apparently as well as really American, and protected by American papers only, but you are to be vigilant that vessels or cargoes really American, but covered by Danish or other foreign papers, and bound to or from French ports, do not escape you."
These orders given by the executive under the construction of the act of congress made by the department to which its execution was assigned, enjoin the seizure of American vessels sailing from a French port. Is the officer who obeys them liable for damages sustained by this misconstruction of the act, or will his orders excuse him? If his instructions afford him no protection, then the law must take its course, and he must pay such damages as are legally awarded against him; if they excuse an act not otherwise excusable, it would then be necessary to inquire whether this is a case in which the probable cause *179 which existed to induce a suspicion that the vessel was American, would excuse the captor from damages when the vessel appeared in fact to be neutral.
I confess the first bias of my mind was very strong in favour of the opinion that though the instructions of the executive could not give a right, they might yet excuse from damages. I was much inclined to think that a distinction ought to be taken between acts of civil and those of military officers; and between proceedings within the body of the country and those on the high seas. That implicit obedience which military men usually pay to the orders of their superiors, which indeed is indispensably necessary to every military system, appeared to me strongly to imply the principle that those orders, if not to perform a prohibited act, ought to justify the person whose general duty it is to obey them, and who is placed by the laws of his country in a situation which in general requires that he should obey them. I was strongly inclined to think that where, in consequence of orders from the legitimate authority, a vessel is seized with pure intention, the claim of the injured party for damages would be against that government from which the orders proceeded, and would be a proper subject for negotiation. But I have been convinced that I was mistaken, and I have receded from this first opinion. I acquiesce in that of my brethren, which is, that the instructions cannot change the nature of the transaction, or legalize an act which without those instructions would have been a plain trespass.
It becomes therefore unnecessary to inquire whether the probable cause afforded by the conduct of the Flying-Fish to suspect her of being an American, would excuse Captain Little from damages for having seized and sent her into port, since had she actually been an American, the seizure would have been unlawful?
Captain Little then must be answerable in damages to the owner of this neutral vessel, and as the account taken by order of the circuit court is not objectionable on its face, and has not been excepted to by council before the proper tribunal, this court can receive no objection to it.
There appears then to be no error in the judgment of the circuit court, and it must be affirmed with costs.