## BATES *v.* CLARK.

1. In the absence of any different provision by treaty or by act of Congress, all the country described by the first section of the act of June 30, 1834 (4 Stat. 729), as Indian country, remains such only as long as the Indians retain their title to the soil.

2. Whatever may be the rule in time of war and in the presence of actual hostilities, military officers can no more protect themselves than civilians for wrongs committed in time of peace under orders emanating from a source which is itself without authority in the premises. Hence a military officer, seizing liquors supposed to be in Indian country when they are not, is liable to an action as a trespasser.

3. The difference between the value of the goods so seized, at the place where they were taken and the place where they were returned to the owners, is the proper measure of damages.

ERROR to the Supreme Court of the Territory of Dakota. The facts are stated in the opinion of the court.

*Mr. Assistant Attorney-General Smith* for the plaintiffs in error.

*Mr. John B. Sanborn, contra.*

MR. JUSTICE MILLER delivered the opinion of the court.

The plaintiff in error, Bates, was a captain in the army of the United States, in command at Fort Seward, in the Territory of Dakota, near the crossing of the James River by the North Pacific Railroad; and Yeckley, the other plaintiff in error, was a lieutenant under him at the time of the commission of the trespass for which the judgment in this case was recovered against them. The defendants in error, plaintiffs below, were doing a general mercantile business on the James River, also near said crossing, when a lot of whiskey, part of their stock of goods, was seized by defendants. They brought this action to recover damages for the trespass. The defendants pleaded their official character, that the place where the

seizure was made was Indian country, and it· was, therefore, their duty to seize the whiskey which was kept there for purpose of sale, and that, in accordance with the acts of Congress on that subject, they had delivered the whiskey to the marshal· of the United States, under a writ from the proper court, on a proceeding·instituted by the United States attorney for that district. They further pleaded, that before the commencement of this action the goods had been delivered to plaintiffs by the marshal, and that plaintiffs had suffered no damage. They also set up an order of the commanding officer of the department of Dakota.

The act of June 30, 1834, entitled "An Act to regulate trade and intercourse with the Indian tribes and to preserve peace on the frontier," which is a very long and important act, begins by describing in its first section the country or territory in which that act shall be operative. It is in these words:—

"Be it enacted, that all that·part of the United States west of the Mississippi, and not within the·States of Missouri and Louisiana, or the Territory of Arkansas, and also that part of the United States ·east of the Mississippi River, and not within any State to which the Indian ·title has not been extinguished, for the purposes of this act, be taken and deemed Indian country." 4 Stat. 729.

The twentieth section of that act forbids the introduction of wines or spirituous liquors within this Territory. By the act of 1864, amending this section, it is made lawful for any Indian agent or commanding·officer of a military post, who has reason to suspect that spirituous liquors or wines have been, or are about to be, introduced into Indian country in violation of law, to search for and seize the same, to be delivered over to the proper officer, and proceeded against by ·libel in the proper court, and forfeited, one half to the informer and the other half to the use of the United States.· 13 id. 29.

If this whiskey was seized in Indian country, within the meaning of the act of 1834 and the amendment of 1864, the plea which set up that the defendants acted in good faith under that statute ought to be sustained. This, the principal question in the case, is raised by the action of the court below in striking out the plea which set up these defences as sham and frivolous,

and because the *locus in quo* was not Indian country. This mode of disposing of a plea which fairly raises a most important issue of law seems to be growing in favor in the territorial courts. It is an unscientific and unprofessional mode of raising and deciding a pure issue of law. This should always be done, when it can, by a demurrer, which is the recognized and appropriate mode in the common law; or by exception, which amounts to the same thing in the civil law, as it is applied to answers in chancery practice. A motion to strike out a plea is properly made when it has been filed irregularly, is not sworn to, if that is required, or wants signature of counsel, or any defect of that character; but if a real and important issue of law is to be made, that issue should be raised by demurrer.

In the present case, this is unimportant, as the same question is presented by the prayer for instructions and by the charge of the court.

What, then, is Indian country, within the meaning of the acts of Congress regulating intercourse with the Indians?

The first act of Congress on the subject is that of March 30, 1802. 2 Stat. 139. The first section of that act describes a boundary, the description occupying over a page of the statute-book, and declares that this shall be distinctly marked under orders of the President, and considered as the line of the Indian territory, or Indian country as it is called indifferently in several sections of the act. The country west of the Mississippi then belonged to France or Spain. The boundary above mentioned, commencing at the mouth of the Cayahoga River, on Lake Erie, now Cleveland, runs in a wonderfully tortuous course through the country north-west of the Ohio River to the falls of that river, now Louisville, then down that river to a point between the mouths of the Cumberland and Tennessee Rivers, and thence through Kentucky, Tennessee, and Georgia, to the St. Mary's River, pursuing all the way the lines represented by treaties with various Indian tribes.

Though many statutes concerning intercourse with the Indians and prescribing offences within the Indian country were passed, no other attempt to define what was Indian country was made by Congress until the act of 1834, the first section of which we have given *verbatim*. In the mean time, we had

purchased the country west of the Mississippi, and had organized two States and a Territory there, and most of the Indians with whom we had to deal lived there. The country east of the Mississippi, and not within any State, was the region north of Illinois and Indiana, and north-west of Ohio, now constituting the States of Michigan and Wisconsin, and then under the government of the Michigan Territory.

Notwithstanding the immense changes which have since taken place in the vast region covered by the act of 1834, by the extinguishment of Indian titles, the creation of States and the formation of territorial governments, Congress has not thought it necessary to make any new definition of Indian country. Yet during all this time a large body of laws has been in existence, whose operation was confined to the Indian country, whatever that may be. And men have been punished by death, by fine, and by imprisonment, of which the courts who so punished them had no jurisdiction, if the offences were not committed in the Indian country as established by law. These facts afford the strongest presumption that the Congress of the United States, and the judges who administered those laws, must have found in the definition of Indian country, in the act of 1834, such an adaptability to the altered circumstances of what was then Indian country as to enable them to ascertain what it was at any time since then.

If the section which we have given *verbatim* be read with a comma or semicolon inserted after the word " State," or if, without the insertion of any point there, we read it so as to apply the words, " to which the Indian title has not been extinguished," to all the region mentioned in the section, we have a criterion which will always distinguish what is Indian country from what is not, so long as the existing system governing our relations with Indians is continued. Read hastily, it might appear that these words were limited in their application to that part of the United States east of the Mississippi River. But a strict reading in that sense is that it is the *State* to which the Indian title has not been extinguished that governs the matter. " And not within any State to which the Indian title has not been extinguished," implies that Indians had title to some State then in existence, and that there were other States

to which their title had been extinguished. This meaning is too absurd to be considered.

On the other hand, if the section be read as describing lands west of the Mississippi, outside of the States of Louisiana and Missouri, and of the Territory of Arkansas, and lands east of the Mississippi not included in any State, but lands alone to which the Indian title has not been extinguished, we have a description of the Indian country which was good then, and which is good now, and which is capable of easy application at any time.

The simple criterion is that as to all the lands thus described it was Indian country whenever the Indian title had not been extinguished, and it continued to be Indian country so long as the Indians had title to it, and no longer. As soon as they parted with the title, it ceased to be Indian country, without any further act of Congress, unless by the treaty by which the Indians parted with their title, or by some act of Congress, a different rule was made applicable to the case.

In the case of *The American Fur Company* v. *The United States*, 2 Pet. 358, decided in 1829, the goods of the company had been seized for violating the laws by their introduction into the Indian country under the act of 1802. This court held that if, by treaties made with the Indians after the passage of that act, their title to the region where the offence was committed had been extinguished, it had thereby ceased to be Indian country, and the statute did not apply to it.

So in the case of *United States* v. *Forty-three Gallons of Whiskey*, decided at the last term, 93 U. S. 188, where this act of 1834 was fully considered; while the court holds that by a certain clause in the treaty by which the *locus in quo* was ceded by the Indians, it remained Indian country until they removed from it, the whole opinion goes upon the hypothesis that when the Indian title is extinguished it ceases to be Indian country, unless some such reservation takes it out of the rule. When this treaty was made, in 1864, the land ceded was within the territorial limits of the State of Minnesota. The opinion holds that it was Indian country before the treaty, and did not cease to be so when the treaty was made, by reason of the special

clause to the contrary in the treaty, though within the boundaries of a State.

It follows from this that all the country described by the act of 1834 as Indian country remains Indian country so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or by act of Congress.

The plaintiffs below violated no law in having the whiskey for sale at the place where it was seized; and the twentieth section of the act of 1834, as amended by the act of 1864, conferred no authority whatever on the defendants to seize the property.

It is a sufficient answer to the plea, that the defendants were subordinate officers acting under orders of a superior, to say that whatever may be the rule in time of war and in the presence of actual hostilities, military officers can no more protect themselves than civilians in time of peace by orders emanating from a source which is itself without authority. The authority of the commandant of the post in the case was precisely the same as the Indian agent or sub-agent, or superintendent; and it will hardly be maintained that if either of them, wholly mistaking their powers, had seized the goods, he would have incurred no liability.

So the plea that they had good reason to believe that this was Indian country, and that they acted in good faith, while it might excuse these officers from punitory damages, is no defence to the action. If it had been Indian country, and it had turned out that the plaintiffs had a license, or did not intend to sell or introduce the goods, the fact that defendants acted on reasonable ground would have exempted them from liability.

But the objection fatal to all this class of defences is that in that locality they were utterly without any authority in the premises; and their honest belief that they had is no defence in their case more than in any other, where a party mistaking his rights commits a trespass by forcibly seizing and taking away another man's property.

There was here no process from a competent court, nor any order from any source having authority, and there is, therefore, no defence.

As the damages found in the verdict are measured by the

14

difference in value of the property at the time and place where seized, and the time and place where returned to the possession of the plaintiffs, we see no error in the rule by which they were ascertained.                    *Judgment affirmed.*