## UNITED STATES *v.* EWING *et al.*

### (*District Court, D. South Dakota.* October 14, 1891.)

1. INDIANS—CRIMES ON RESERVATIONS—JURISDICTION OF UNITED STATES COURTS.

Act Cong. June 30, 1834, (4 St. at Large, 729,) defines the territory which should be known as the "Indian Country," including therein the region now included in the Dakotas, and provides that the laws of the United States relating to the punishment of crimes within the "exclusive jurisdiction of the United States shall be in force in the Indian country," except as to crimes committed by Indians against each other. By treaty of April 19, 1858, (11 St. at Large, 743,) with the Yankton tribe, whereby certain lands were ceded, and 400,000 acres reserved to the Indians, the United States agreed to protect them in their possession thereof, and also in "their persons and property therein during good behavior." Act Cong. March 2, 1861, (12 St. at Large, 239,) creating the territory of Dakota, provides that nothing therein contained shall be construed to "impair the rights of persons or property pertaining to the Indians in said territory, and that all the Indian lands therein shall be excepted out of its boundaries and jurisdiction" until title is extinguished by treaty with the United States. Act Cong. Feb. 22, 1889, providing for the organization of the states of North and South Dakota, declared that "the people of said states do agree and declare that they forever disclaim all right and title * * * to all lands lying within said limits, owned or held by any Indian or Indian tribes," and that the same "shall be and remain under the absolute jurisdiction and control of the congress of the United States." *Held,* that the United States district court has jurisdiction of an indictment against a white man for stealing the horses of an Indian on the Yankton reservation, under Act Cong. April 30, 1790, (Rev. St. § 5356,) which provides for the punishment of larceny committed "within any of the places under the sole and exclusive jurisdiction of the United States."

2. INDICTMENT—VENUE.

An indictment for a larceny committed "in the county of Charles Mix, in the district aforesaid, and at a place in said county of Charles Mix within the Great Sioux Indian reservation and within the Indian country," sufficiently alleges the venue, although the name "Great Sioux Reservation" is more properly applicable to another Sioux reservation in the state.

At Law. On demurrer to an indictment for a larceny committed on an Indian reservation.

*Wm. B. Sterling,* U. S. Dist. Atty.

*Hoppaugh & Ellis,* for defendants.

Before SHIRAS and EDGERTON, JJ.

SHIRAS, J. In the indictment found in this case the defendants are charged with the crime of larceny, it being averred that they, on the 16th day of April, 1889, did steal five horses, the property of one Thomas Hunter, an Indian of the Sioux tribe, the venue of the offense being laid in Charles Mix county, in the district of South Dakota, within the Great Sioux Indian reservation and within the Indian country. The indictment does not state whether the defendants are Indians or white men; and in support of the demurrer it is urged that this court does not have jurisdiction of crimes committed by white men on the Indian reservation in Charles Mix county, or to state the proposition in the language used in the brief of counsel for defendants:

"The point we make is this: It is absolutely necessary to aver in the indictment that the persons charged with the crime were Indians, because, if they were not Indians, the court would have no right or authority to try them. If these defendants are white men, there is no jurisdiction over them vested in the United States courts. If they are white men, there is no law or

statute under which the offense charged in the indictment is a crime against the United States, or punishable by their authority."

It is admitted by counsel for defendants that under the provisions of section 9 of the act of congress of March 3, 1885, courts of the United States have jurisdiction over Indians for the offenses named therein and committed within the boundaries of an Indian reservation existing within the limits of a state, but is contended that such jurisdiction does not exist in case the offender is a white man. The solution of the question thus presented requires an examination of the laws and treaties touching the reservation in Charles Mix county, for the purpose of determining whether the same remains within the exclusive jurisdiction of the United States. The act of congress of June 30. 1834, (4 St. at Large, 729,) defined the territory that should be known as the "Indian Country," including therein the region afterwards formed into the territory of Dakota, and further enacted—

"That so much of the laws of the United States as provides for the punishment of crimes committed within any place within the sole and exclusive jurisdiction of the United States shall be in force in the Indian country: provided, that the same shall not extend to crimes committed by one Indian against the person or property of another."

By section 16 of the act of April 30, 1790, (1 St. at Large, 116,) it was declared "that, if any person within any of the places under the sole and exclusive jurisdiction of the United States, or upon the high seas, shall take and carry away, with intent to steal or purloin, the personal goods of another," such person should be punished as therein provided; and this provision in substance has ever since been continued in force, and is now found in section 5356 of the Revised Statutes. If, therefore, a white man steals the property of another at any place within the exclusive jurisdiction of the United States, he is liable to indictment and punishment in the courts of the United States under the provisions of this section of the statute; and, as already stated, by the statute of 1834, the Indian country was expressly declared to be within such jurisdiction. The reservation in Charles Mix county was established by a treaty entered into between the United States and the Yankton tribe of the Sioux under date of April 19, 1858, and approved by the senate February 16, 1859. See 11 St. at Large, 743. By the terms of this treaty the Indians ceded to the United States a large extent of territory, extending from the mouth of the Big Sioux river, along the Missouri river, to East Medicine Knife river, saving and reserving to themselves, however, a tract of 400,000 acres; and in consideration of such relinquishment by the Indians, the United States agreed "to protect the said Yanktons in the quiet and peaceable possession of the said tract of four hundred thousand acres of land so reserved for their future home, and also their persons and property thereon, during good behavior on their part." Thus we find that the United States had not only extended the laws forbidding the stealing of property and punishing the same when committed by white men over the Indian country, which included the Yankton reservation, but by treaty the United States had agreed to protect the persons and prop-

erty of the Yanktons on the reservation set apart for their occupancy; and, certainly, protection to their property would include the **duty of** punishing white men who should steal such property.

By the act of March 2, 1861, (12 St. at Large, 239,) the territory of Dakota was created, it being declared in the act—

"That nothing in this act contained shall be construed to impair the rights of person or property now pertaining to the Indians in said territory, so long as such rights shall remain unextinguished by treaty between the United States and such Indians, or to include any territory which, by treaty with any Indian tribe, is not, without the consent of said tribe, to be included within the territorial limits or jurisdiction of any state or territory; but all such territory shall be accepted out of the boundaries and constitute no part of the territory of Dakota until said tribe shall signify their assent to the president of the United States to be included within said territory, or to affect the authority of the government of the United States to make any regulations respecting such Indians, their lands, property, or other rights, by treaty law or otherwise, which it would have been competent for the government to make if this act had never passed."

Certainly, under the terms of this section of the act, there was reserved to the United States jurisdiction over the Indian reservations, with full power and authority to make provision for the proper protection of the personal and property rights of the Indians against all wrongs committed by white men within the boundaries of the reservation. In the cases of *U. S.* v. *43 Gallons of Whiskey,* 93 U. S. 188, and *Bates* v. *Clark,* 95 U. S. 204, the question of what is to be deemed Indian country is considered at length, the conclusion being reached—

"That all the country described by the act of 1834 as Indian country remains Indian country so long as the Indians retain their original title to the soil, and ceases to be Indian country whenever they lose that title, in the absence of any different provision by treaty or by act of congress."

And in the case of *Ex parte Crow Dog,* 109 U. S. 556, 3 Sup. Ct. Rep. 396, this subject is exhaustively treated in a case coming from the territory of Dakota, in which it was held that the district court of Dakota, sitting as a circuit court of the United States, had jurisdiction, under the laws of the United States, over offenses made punishable by those laws committed within that part of the Sioux reservation which was within the limits of the territory ; it being further ruled that the definition of the Indian country found in the act of 1834—

"Now applies to all the country to which the Indian title has not been extinguished within the limits of the United States, even when not within a reservation expressly set apart for the exclusive occupancy of Indians, although much of it has been acquired since the passage of the act of 1834, and notwithstanding the formal definition in that act has been dropped from the statutes, excluding, however, any territory embraced within the exterior geographical limits of a state, not excepted from its jurisdiction by treaty or by statute at the time of its admission into the Union, but saving, even in respect to the territory not thus excepted and actually in the exclusive occupancy of Indians, the authority of congress over it under the constitutional power to regulate commerce with the Indian tribes, and under any treaty made in pursuance of it."

It cannot, therefore, be questioned that the Indian reservation found within the borders of Charles Mix county forms part of what is known as the "Indian Country," and that the same was, so far as was necessary for the protection of the Indians, within the exclusive jurisdiction of the United States up to the time of the admission of South Dakota as a state of the Union.

Turning now to the omnibus act of February 22, 1889, under which the state of South Dakota was organized, we find it therein provided—

"That the people of said states do agree and declare that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits, owned or held by any Indian or Indian tribes; and that, until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the congress of the United States."

In determining the construction to be given to these provisions of the omnibus bill, great aid is derived from the ruling of the supreme court in the case of the *Kansas Indians*, 5 Wall. 737. The various treaties made with the Shawnees and other tribes are cited in that case for the purpose of showing that by treaty the United States had undertaken the duty of protecting the persons and property of the Indians upon their reservations, which duty, it was held, was not terminated by the admission of Kansas as a state, it being said:

"If the tribal organization of the Shawnees is preserved intact and recognized by the political department of the government as existing, then they are 'a people distinct from others,' capable of making treaties, separated from the jurisdiction of Kansas, and to be governed exclusively by the government of the Union. If under the control of congress, from necessity there can be no divided authority. If they have outlived many things, they have not outlived the protection afforded by the constitution, treaties, and laws of congress. * * * There can be no question of state sovereignty in the case, as Kansas accepted her admission into the family of states on condition that the Indian rights should remain unimpaired, and the general government at liberty to make any regulation respecting them, their lands, property, or other rights which it would have been competent to make if Kansas had not been admitted into the Union. The treaty of 1854 left the Shawnee people a united tribe, with a declaration of their dependence on the national government for protection and the vindication of their rights. * * * As long as the United States recognizes their national character, they are under the protection of treaties and the laws of congress, and their property is withdrawn from the operation of state laws."

In the case of *U. S.* v. *Rogers*, 4 How. 567, it was held that congress may by law provide for the punishment of any offense committed by a white man or an Indian within any country occupied by the Indians and not within the limits of any state. In *U. S.* v. *Kagama*, 118 U. S. 375, 6 Sup. Ct. Rep. 1109, after a very full discussion of the relations between the Indian tribes and the state and federal governments, it is said:

"These Indian tribes are the wards of the nation. They are communities dependent on the United States, dependent largely for their daily food, de-

pendent for their political rights. They owe no allegiance to the states, and receive from them no protection. * * * From their very weakness and helplessness, so largely due to the course of dealing of the federal government with them and the treaties in which it has been promised, there arises the duty of protection, and with it the power. This has always been recognized by the executive and by congress and by this court whenever the question has arisen."

It was therefore held that congress had the power to define and punish crimes committed within reservations lying within the boundaries of the states "relating to matters to which the federal authority extends."

As has been already stated, we find in the treaty between the United States and the Yankton Sioux, whereby the reservation in Charles Mix county was set apart for the use of the Indians, that the United States, in consideration of the cession of lands made by the Indians, agreed "to protect the said Yanktons in the quiet and peaceable possession of the said tract of 400,000 acres of land so reserved for their future home, and also their persons and property thereon, during good behavior on their part." Thus the United States assumed the double duty of preserving to the Indians the quiet possession of the reservation as their future home and of protecting their persons and property thereon, and this duty and obligation still exists, never having been released by the action of the Indians or by treaty or agreement with them. To fulfill the duty thus undertaken, it is clear that the United States must possess the absolute control over the land included within the reservation, and also the right to enact all the laws needed for the protection of the persons and property of the Indians on the same. The reservations and provisions found in the act creating the territory of Dakota and the state of South Dakota, whereby there is reserved to the United States the absolute jurisdiction and control over the Indian lands, were unquestionably included therein for the purpose of preventing any question arising as to the continued power and control of the United States over the Indian country, such continued power and control being necessary to enable the United States to discharge its treaty obligations and duties to the Indians. It is argued by counsel that the reservation of absolute jurisdiction and control over the Indian lands contained in the omnibus act is to be confined to the mere matter of the ownership of the title and control of the right of taxation, but such limited construction is not admissible. The reservation was meant to be as broad as the duty which the United States assumed in regard to these lands, which was to secure to the Indians the peaceful possession thereof as their home, and to protect their persons and property thereon. It thus appearing that the United States has by treaty assumed the duty of protecting the persons, property, and lands of the Indians on the reservation in question, and has reserved for these purposes the absolute jurisdiction and control over the reservation, it follows that the same is within the exclusive jurisdiction of the United States, and that, therefore, the provisions of section 5356 of the Revised Statutes are applicable thereto, which declare it to be an offense against

the laws of the United States for any one to steal the property of another within any place within the exclusive jurisdiction of the United States. If this conclusion be correct, it follows that, if a white man steals the property of an Indian on such reservation, he commits a crime against the laws of the United States, of which the United States district court has jurisdiction, the said act being a violation of section 5356 of the Revised Statutes; and, if an Indian commits a like act, he violates the provisions of section 9 of the act of 1885; and in either event the United States court has jurisdiction of the offenders and of the offense, and it is not, therefore, necessary to aver in the indictment that the defendants are either white men or Indians.

It is further urged in support of the demurrer that the indictment is faulty because it describes the reservation as the Great Sioux reservation, which, it is claimed, is an appellation properly belonging to another reservation within South Dakota. The venue of the offense is laid in the indictment as being "in the county of Charles Mix, in the district aforesaid, and at a place in said county of Charles Mix within the Great Sioux Indian reservation and within the Indian country." It is clearly charged that the offense was committed in the Indian country embraced within the boundaries of Charles Mix county. The Indian country within that county is a reservation for the Yankton tribe of the Sioux Indians, and, whether it is a misnomer to or not to call it part of the Great Sioux Indian reservation, no one would be misled by such description. The indictment is applicable only to an offense committed in the Indian country within Charles Mix county, and whether that part of the Indian country is or is not a part of the Great Sioux Indian reservation is immaterial. The fact is that different portions of the Indian country have been set apart as reservations for the different bands to which the name "Sioux" has been applied, and in one sense all the lands thus appropriated to the Sisseton, Yankton, Ogallalah, Brule, and other bands may be said to form the Great Sioux reservation. But, however this may be, the indictment clearly charges that the offense was committed in the Indian country within Charles Mix county, in the district and state of South Dakota, and hence the venue is properly laid. The demurrer is therefore overruled.

EDGERTON, J., concurs.