George H. BENFORD

v.

AMERICAN BROADCASTING COMPANIES, INC., and Mrs. Isaac (Betty) Hamburger and Miss Kathleen T. Gardner and Mrs. Lillian M. Teitelbaum and David L. Holton and Margaret Osmer.

Civ. A. No. N–79–2386.

United States District Court,
D. Maryland.

Dec. 22, 1982.

Wilson K. Barnes and Little, Hall & Steinmann, P.A., Baltimore, Md., and Dean E. Sharp, Washington, D.C., for plaintiffs.

Alan I. Baron, Baltimore, Md., Ellen Scalettar and Finley, Kumble, Wagner, Heine, Underberg & Casey, Washington, D.C., for defendants American Broadcasting Co., Inc. and Margaret Osmer.

Stanley M. Brand, Steven R. Ross and Michael L. Murray, Washington, D.C., for

defendants Miss Kathleen T. Gardner, Mrs. Lillian M. Teitelbaum, David L. Holton and Mrs. Isaac (Betty) Hamburger.

NORTHROP, Senior District Judge.

## MEMORANDUM

Plaintiff, George H. Benford, instituted the present action against American Broadcasting Companies, Inc., (ABC), Margaret Osmer,* an ABC employee, David L. Holton, Chief Investigator for the Select Committee on Aging, United States House of Representatives (Select Committee), Kathleen T. Gardner, professional staff member of the Select Committee, and Betty Hamburger and Lillian M. Teitelbaum, both special senior citizen investigators of the Select Committee. Defendants Holton, Gardner, Hamburger, and Teitelbaum will hereinafter be referred to collectively as the "congressional defendants".** As the complaint is the same as that outlined in detail in *Benford v. American Broadcasting Companies, Inc.,* 502 F.Supp. 1148 (D.Md.1980), the facts need not be repeated exhaustively here.

Briefly, the plaintiff is an insurance salesman who was surreptitiously filmed by ABC while making his standard cancer insurance sales presentation to the congressional defendants, who were posing as prospective purchasers. Portions of that taped meeting were broadcast on the ABC Nightly News, and are alleged to have caused the plaintiff grave financial and other injury. The plaintiff claimed the taping and broadcasting subjects the defendants to liability under the Maryland Wiretapping and Electronic Surveillance Act, Md.Cts. & Jud.Proc. Code Ann. §§ 10–401, *et seq.,* (hereinafter sometimes referred to as "The Maryland Act"), the Fourth Amendment of the Constitution, Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510, *et seq.,* (hereinafter sometimes referred to as the "Federal Eavesdropping Statute"), and the common law torts of civil

conspiracy, malicious interference with business relations, and invasion of privacy.

The congressional defendants responded to these charges by filing a motion to dismiss, or alternatively for summary judgment, as to each cause of action. Their primary contentions were that their conduct was absolutely protected by the Speech or Debate Clause of the Constitution, Art. I, § 6, cl. 1, and/or the common law doctrine of official immunity. This Court considered those arguments and, on November 14, 1980, held that the congressional defendants are not absolutely immune under either the Speech or Debate Clause or the official immunity doctrine, but suggested that upon a proper showing, the congressional defendants would be entitled to assert a defense of qualified immunity as defined by the Supreme Court in *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1978). *Benford v. American Broadcasting Companies, Inc.,* 502 F.Supp. 1148, 1159 (D.Md.1980). A decision as to the viability of the qualified immunity defense was not then reached.

Defendants ABC and Osmer then filed motions to dismiss Counts II and IV of plaintiff's amended complaint. Count II alleged defendants violated plaintiff's Fourth Amendment rights by conducting an unconstitutional search and seizure. Count IV charged the defendants with violating the Federal Eavesdropping Statute. This Court agreed with the defendants ABC and Osmer as to the non-viability of Count II and on November 24, 1980, it was dismissed. Because a genuine issue of material fact remained which would impact on the viability of Count IV, this Court refused to dismiss that count. *Benford v. American Broadcasting Companies, Inc.,* 502 F.Supp. 1159 (D.Md.1980). On January 14, 1981, in response to the congressional defendants renewed motion to dismiss, filed November 25, 1980, this Court dismissed Count II of plaintiff's complaint as it applied to the congressional defendants as well.

---

* Currently Margaret Osmer-McQuade.

** On information and belief, the plaintiff represents to this Court that of these congressional

defendants, only defendant Holton continues to regularly perform Congressional/public duties.

On July 16, 1982, this Court entered an order staying further discovery in this case with respect to the congressional defendants, pending the Court's consideration of the possible impact of *Nixon v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2690, 73 L.Ed.2d 349 (1982), and *Harlow v. Fitzgerald,* —— U.S. ——, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), on the qualified immunity issue. Written discovery not involving the congressional defendants was not affected by the stay. The parties have since filed exhaustive memoranda outlining their respective positions.

Predictably, the plaintiff and the congressional defendants view *Harlow* from different perspectives. The congressional defendants argue that as a result of these decisions, they are now entitled to summary judgment for all remaining counts on the basis of qualified immunity. The plaintiff, on the other hand, contends defendants have failed to meet even the threshold requirements necessary to bring *Harlow* into play. Furthermore, even assuming the congressional defendants met their threshold burden, the plaintiff argues the congressional defendants are nevertheless not entitled to qualified immunity as they have not satisfied the *Harlow* standards. As a result, the plaintiff asks this Court to reject the congressional defendants' renewed claim that they are entitled to summary judgment. The Court will herein decide this narrow, but important question.

## I.

### HARLOW V. FITZGERALD

In *Harlow,* the petitioners, Bryce Harlow and Alexander Butterfield, were charged with participating in a conspiracy to violate the constitutional and statutory rights of the respondent, A. Ernest Fitzgerald. The petitioners were aides to former President Richard M. Nixon and were alleged to have arranged for the retaliatory firing of Fitzgerald, a "whistleblower". Fitzgerald was intent on exposing shoddy purchasing practices in the Department of Defense which resulted in cost overruns and which were politically embarrassing to the Nixon administration. The petitioners moved for summary judgment and contended they were entitled to absolute and qualified official immunity as aides to the President.

■ In reviewing the petitioners' claim of absolute official immunity, the Supreme Court reaffirmed the established principle that government officials are entitled to absolute immunity when their special functions or constitutional status requires complete protection from suit. To hold otherwise would be to risk undue interference with their important public duties. The doctrine was not available, however, to aides to the President, either directly or in derivative fashion. Relying on *Butz v. Economou, supra,* where the Court earlier held that as a general rule absolute immunity does not protect Cabinet officers, the *Harlow* Court said it would be "untenable to hold absolute immunity an incident of the office of every Presidential subordinate based in the White House". *Harlow v. Fitzgerald,* 102 S.Ct. at 2734. Nevertheless, absolute immunity may still be claimed by legislators in their legislative functions, judges in their judicial functions, prosecutors in their prosecutorial functions, executive officers in their adjudicative functions, and by the President of the United States. *Harlow v. Fitzgerald,* 102 S.Ct. at 2733. *See also: Eastland v. United States Servicemen's Fund,* 421 U.S. 491, 95 S.Ct. 1813, 44 L.Ed.2d 324 (1975); *Stump v. Sparkman,* 435 U.S. 349, 98 S.Ct. 1099, 55 L.Ed.2d 331 (1978); *Butz v. Economou, supra, Nixon v. Fitzgerald, supra.*

■ Correspondingly, under *Harlow,* the defense of qualified immunity remains available to public officials, absent special circumstances. To raise this defense, an official must show (1) his actions were taken "reasonably and in good faith", and (2) that his conduct was authorized.[1]

---

1. The authorization requirement, reviewed by this Court in 1980, was not modified in *Harlow. See* 102 S.Ct. 2739 n. 34.

As the Supreme Court explained in *Doe v. McMillan,* (412 U.S. 306, 93 S.Ct. 2018, 36 L.Ed.2d 912 (1975)): "The scope of immunity

Prior to *Harlow,* the component parts of the "good faith" standard were identified as being comprised of both objective and subjective elements. The objective element concerned presumptive knowledge of and respect for "basic, unquestioned constitutional rights", and the subjective element referred to "permissible intentions". *Id.* 102 S.Ct. at 2737; *See Wood v. Strickland,* 420 U.S. 308, 320, 95 S.Ct. 992, 999, 43 L.Ed.2d 214 (1975).

But because the extent of an official's subjective good faith was a question of fact, which left to a jury typically resulted in the same discovery costs and disruptions of government the immunity doctrine was designed to prevent, in *Harlow* the Supreme Court modified the "good faith" rule by eliminating the subjective component. The objective element was redefined. *Harlow v. Fitzgerald,* 102 S.Ct. at 2737.

■ Today, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 102 S.Ct. at 2738. Therefore, the good faith standard is purely objective. It is left to the Court, not the jury, to determine whether the plaintiff's constitutional or statutory rights were clearly established at the time the action complained of occurred. If they are held to have been clearly established, an official can succeed only in extraordinary circumstances by proving he neither knew nor should have known of that established standard. *Id.* 102 S.Ct. at 2739.

■ Also relevant to the question presently before the Court is the fact that an official who meets the objectivity test still must show that his conduct was authorized. *See* note 1, *supra. Cf. Nixon v. Fitzgerald, supra.* Therefore, officials who act beyond their scope of authority lack standing to assert a qualified immunity defense even in those instances where their behavior does not violate clearly established constitutional or statutory rights of which a reasonable person would have known. *Cf. Doe v. McMillan, supra.*

## II.

## THE DOCTRINE OF QUALIFIED IMMUNITY—OBJECTIVE GOOD FAITH

The congressional defendants now contend the *Harlow* readjustments to the law of official immunity permit this Court to decide the summary judgment motion *sub judice* without the assistance of a jury. These defendants further argue the record establishes they operated entirely within their official function, i.e., scope of authority, at the time of their allegedly wrongful conduct, and that they easily satisfy the "objective good faith" standard announced in *Harlow* for each of the five counts still at issue. The plaintiff, not surprisingly, disagrees.

As a result of the *Harlow* decision, it is clear this Court may now decide whether the congressional defendants are entitled to qualified immunity in this case. The threshold question is whether the plaintiff alleged violations of "clearly established statutory or constitutional rights of which a reasonable person would have known." [2] *See Harlow v. Fitzgerald,* 102 S.Ct. at 2739.

has always been tied to the 'scope of authority'". 412 U.S. at 320, 93 S.Ct. at 2028 (quoting from *Wheeldin v. Wheeler,* 373 U.S. 647, 651, 83 S.Ct. 1441 at 1444, 10 L.Ed.2d 605 (1963)). To be entitled to official immunity, therefore, the federal officials must show that their conduct was authorized. The mere fact that certain conduct is authorized, however, is insufficient, in itself, to immunize the conduct of federal officials. *See Doe v. McMillan,* 412 U.S. at 322, 93 S.Ct. at 2029. In addition to showing proper authorization the

federal officials must show that they acted reasonably and in good faith.
*Benford v. American Broadcasting Companies, Inc.,* 502 F.Supp. 1148, 1157–1158 (D.Md.1980).

2. The Court is aware of the many other arguments the congressional defendants have offered in support of their Motion to Dismiss, or in the alternative, for Summary Judgment. They are still under consideration. This opinion is intended to address the qualified immunity question only.

If the law the congressional defendants are charged with violating was clearly established, their qualified immunity argument must be rejected without further consideration. However, if the law at the time of their actions was not clearly established, and they therefore acted reasonably and in good faith within this context, the congressional defendants still must demonstrate they operated within the scope of their authority.

This Court will first separately consider whether each of the remaining causes of action allege violations of laws which were clearly established and which a reasonable person would have been aware at the time the earlier described events transpired.

A. *The State of Maryland Wiretapping and Electronic Surveillance Act*

The plaintiff has charged the congressional defendants with conspiring with ABC to surreptitiously tape and broadcast the November 3, 1978, sales promotion meeting on the ABC Nightly News. In Count I of the complaint, these actions are alleged to have violated the plaintiff's statutorily protected rights as codified in the Maryland Wiretapping and Electronic Surveillance Act, Md.Cts. & Jud.Proc.Ann. § 10–401 *et seq.*

Generally, this Act prohibits any person from wilfully intercepting, using or disclosing to another the contents of any wire or oral communication which has been obtained through an unlawful interception. It is apparent that the Maryland General Assembly adopted substantially all of the language in Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. §§ 2510–2520 (1970), with minor modifications, in enacting this legislation. *See Gilbert, A Diagnosis, Dissection, and Prognosis of Maryland's News Wiretapping and Electronic Surveillance Law,* 8 U.Balt.L.Rev. 183, 191 (1979).

The specific sections of the Maryland Act relevant to the congressional defendants' 1978 investigation and their qualified immunity defense read as follows:

§ 10–401. Definitions.

As used in this subtitle, the following terms have the meanings indicated:

(2) "Oral communication" means any conversation or words spoken to or by any person in private conversation.

§ 10–402. Interception of communications generally.

(a) Unlawful acts. Except as otherwise specifically provided in this subtitle it is unlawful for any person to:

(1) Wilfully intercept, endeavor in intercept, any wire or oral communication;

(2) Wilfully disclose, or endeavor to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subtitle; or

(3) Wilfully use, or endeavor to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subtitle.

Maryland Wiretapping and Electronic Surveillance Act, Md.Cts. & Jud.Proc.Code Ann. (1977).

The congressional defendants herein submit that the Maryland Act was so vague at the time the alleged violation took place, they could not fairly be said to have known the law forbade their conduct. Specifically, these defendants direct this Court's attention to the term "private conversation" as it appears in definitional Section 10–401(2), and suggest there was significant doubt surrounding its' meaning in 1978. The inference they would leave the Court is that not knowing what a "private conversation" was under the Act, they could not possibly have known whether or not they were intercepting an "oral communication" under Section 10–402. Thus, they contend they are not subject to suit as they acted in

"good faith" under *Harlow*.[3] The ABC defendants suggest that the Maryland Court of Appeals should interpret this section.

■ Having considered this issue, this Court is of the firm opinion the congressional defendants argument that the term "private conversation" is inherently vague, and that the Maryland Act therefore was not "clearly established" within the context of *Harlow,* is without merit, and there is no reason to certify the question to the Maryland Court of Appeals. One of the clear purposes of the Maryland Act is to prevent, in non-criminal situations, the unauthorized interception of conversations where one of the parties has a reasonable expectation of privacy. Md.Cts. & Jud.Proc.Code Ann. § 10–402(c)(3). Admittedly, the Maryland Act did not define the phrase "private conversation" as it appears in Section 10–401(2). However, it is doubtful that it could have, inasmuch as the rule of reason controls questions concerning expectation of privacy, which, by their nature, are imprecise. *See Warren & Brandeis, The Right to Privacy,* 4 Harv.L.Rev. 193 (1890); *Katz v. United States,* 389 U.S. 347, 352, 88 S.Ct. 507, 511, 19 L.Ed.2d 576 (1967). Such questions can only be decided on a case by case basis, a fact which does not in itself make the controlling statute vague or unclear. *See Benford v. American Broadcasting Companies,* 502 F.Supp. 1159, 1162 (1980). Moreover, the key phrase here is not "private conversation", the defining phrase. Rather, it is "oral communication", the term being defined.

Controlling here is the fact that Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510(2), which served as a model for the Maryland Act, defines "oral communication" as "any communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation." The law of Maryland provides that the Maryland Wiretapping and Electronic Surveillance Act be read so as to safeguard the public to at least that degree.

"(W)hile Title III requires an appropriate state act before it can be effectuated, under no circumstances is the law enforceable if it is less restrictive than the federal statute so that it grants the governing power more rights at the expense of its citizens."

*State of Maryland v. Siegel,* 266 Md. 256, 271, 292 A.2d 86, 94 (1972). As is more fully explained in Section II–C, *infra,* the plaintiff met the Title III "oral communication" test on November 3, 1978. Inasmuch as the congressional defendants failed to comply with this Title III standard, and the law is clear that the Maryland Act is more restrictive, the congressional defendants cannot be said to have satisfied the objective good faith test as outlined in *Harlow.*[4] The Maryland Act was quite clear and understandable. The congressional defendants' request for qualified immunity as to plaintiff's first count must be denied.

## B. Common Law Tort Actions

Count II of the plaintiff's complaint alleges the congressional defendants violated the common law of Maryland by tortiously conspiring, knowingly and maliciously, with ABC to surreptitiously tape and broadcast his November 3, 1978, sales pro-

---

3. The congressional defendants also argue they acted within the scope of their authority, which is the second prong of the qualified immunity test. *See* note 1, *supra.*

4. In reviewing the congressional defendants' conduct, it also seems appropriate to take note of the Supreme Court's admonition:

By defining the limits of qualified immunity essentially in objective terms, we provide no license to lawless conduct ... Where an official could be expected to know that certain conduct would violate statutory or constitutional rights, he should be made to hesi-

tate; and a person who suffers injury caused by such conduct may have a cause of action. *Cf. Procunier v. Navarette,* 434 U.S. 555, 565, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978) (footnote omitted) ("Because they could not reasonably have been expected to be aware of a constitutional right that had not yet been declared, petitioners did not act with such disregard for established law that their conduct 'cannot reasonably be characterized as being in good faith.' ").
*Harlow v. Fitzgerald,* 102 S.Ct. at 2739.

motion meeting, thereby causing him great injury. Count V avers the congressional defendants' above-described activities interfered with plaintiff's right to pursue a lawful insurance business, and that this was a tortious interference with his business relations. Plaintiff's Count VI seeks damages for tortious invasion of privacy.

■ The congressional defendants submit *Harlow* is inapplicable to common law claims, and that a showing they acted within the scope of their authority will altogether immunize them from the legal consequences arising out of their commission, if any, of these common law torts.[5] The plaintiff disagrees, and contends *Harlow* is in fact relevant to common law causes of action. In other words, the plaintiff considers the qualified immunity defense to be unavailable to the congressional defendants if this Court finds the laws of Maryland governing the state common law tort claims were clearly established and would reasonably have been known by these defendants at the time of their allegedly wrongful actions occurred, regardless of their scope of authority.

The congressional defendants are correct. In *Harlow* the Supreme Court modified the standards for qualified immunity narrowly. Only statutory and constitutional claims were affected. The Court's conclusion was clear:

> We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct

does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 102 S.Ct. at 2738.

In *Butz v. Economou, supra,* the Supreme Court established this dichotomy by inference. There, qualified immunity defenses raised in response to common law claims and those raised in response to constitutional and statutory claims were considered separately. Therefore, *Harlow* merely followed precedent, and the qualified immunity defense, as it has traditionally applied to common law actions, was not affected. Consequently, the fact that the Maryland law of torts governing these common law counts was clearly established in November 6, 1978,[6] does not in and of itself jeopardize the congressional defendants' qualified immunity position. *See also Howard v. Lyons,* 360 U.S. 593, 79 S.Ct. 1331, 3 L.Ed.2d 1454 (1959), (where the Supreme Court upheld the pre-trial dismissal of a complaint for defamation under state law, when it was alleged a federal officer knowingly and deliberately published false information; the ground for dismissal was that the officer acted within the scope of his authority); *Bishop v. Tice,* 622 F.2d 349, 359 (8th Cir. 1980) ("Although federal supervisors would normally enjoy absolute immunity from liability in tort for actions relating to the discharge of their subordinates (citation omitted) absolute immunity is lost when a supervisor adopts means beyond the outer perimeter of his authority"); *Mandel v. Nouse,* 509 F.2d 1031, 1033 (6th Cir.1975)

---

**5.** The congressional defendants phrased their argument as follows:

> (T)he qualification or limitation placed on the official immunity by *Harlow* is only for conduct which 'violate(s) clearly established *statutory* or *constitutional* rights ...' ... In regard to common law torts *Harlow* leaves *Butz v. Economou,* 438 U.S. 478, 98 S.Ct. 2894, 57 L.Ed.2d 895 (1979) (sic), and *Barr v. Matteo,* 360 U.S. 564, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959) intact—government officials are immune from the alleged commission of common law torts if acting within their authority.

*Congressional Defendants' Supplemental Memorandum on the Impact of Harlow v. Fitzgerald,* at 14.

*Butz v. Economou* and *Barr v. Matteo* held, *inter alia,* that a federal official may not be held liable for the commission of a common law tort, despite allegations of malice, so long as his actions were taken within the limits of his authority.

**6.** *See Green v. Washington Suburban Sanitary Commission,* 259 Md. 206, 269 A.2d 815 (1970) (civil conspiracy); *Baird v. C & P Tel. Co. of Baltimore,* 208 Md. 245, 117 A.2d 873 (1955) (tortious interference with contract); *Beane v. McMullen,* 265 Md. 585, 191 A.2d 37, *appeal after remand* 20 Md.App. 383, 315 A.2d 777 (1972) (interference with business relations, privacy); *Carr v. Watkins,* 227 Md. 578, 177 A.2d 841 (1962) (privacy).

("(e)ach of the defendants was acting within the outer perimeter of his official duties, and they each have immunity from civil defamation suits.")

Therefore, this Court's review of the congressional defendants' qualified immunity defense to these common law counts will be limited to the single issue of whether they acted within the scope of their authority. This is discussed in Section III, *infra*.

C. *Federal Eavesdropping Statute*

In Count IV of his complaint, the plaintiff charged the congressional defendants with violating Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510 *et seq.* These sections outline the federal law governing the interception of wire and oral communication and were enacted as a result of Congress' concern that an individual's privacy be protected. *See Gelbard v. United States,* 408 U.S. 41, 48, 92 S.Ct. 2357, 2361, 33 L.Ed.2d 179 (1972); *U.S. v. Clemente,* 482 F.Supp. 102 (D.C.N.Y.), *aff'd.* 633 F.2d 207 (2d Cir.1979). Again, the congressional defendants raise the defense of qualified immunity.

The sections of this statute relevant to this decision are as follows:

§ 2510.  Definitions.

As used in this chapter—

(2) "oral communication" means any oral communication uttered by a person exhibiting an expectation that such communication is not subject to interception under circumstances justifying such expectation;

§ 2511.  Interception and disclosure of wire or oral communications prohibited.

(1) Except as otherwise specifically provided in this chapter any person who—

(a) wilfully intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire or oral communication; . . .

(c) willfully discloses, or endeavors to disclose to any other person the contents of any wire or oral communica-

tion knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection; or

(d) willfully uses, or endeavors to use, the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection;

shall be fined not more than $10,000 or imprisoned not more than five years, or both.

(2)(c) It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire or oral communication, where such person is a party to the communication or one of the parties to the communication has given prior consent to such interception.

(d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication or one of the parties to the communication has given prior consent to such interception.

(d) It shall not be unlawful under this chapter for a person not acting under color of law to intercept a wire or oral communication where such person is a party to the communication or where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act in the United States or of any State or for the purpose of committing any other injurious act.

The congressional defendants suggest the Federal Eavesdropping Statute "fails to meet the *Harlow* test since it does not constitute a clearly established standard which it would have been reasonable for these defendants to believe governed their conduct." [7] *Congressional Defendants' Supple-*

---

7. The congressional defendants seek summary judgment as to Count IV on other grounds as

well.  For example, they argue that even assuming the statute is clear, its terms have not

*mental Memorandum on the Impact of Harlow v. Fitzgerald,* at 15. In particular, these defendants contend the term "oral communication" as defined in 18 U.S.C. § 2510(2) is unclear. This Court disagrees. The legislative history behind 2510(2) reflects Congress's intent that *Katz v. United States,* 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967), serve as a guide to define communications that are uttered under circumstances justifying an expectation of privacy. S.Rep. No. 1097, 90th Cong., 2d Sess. *reprinted in* (1968) U.S. Code Cong. & Admin.News pp. 2112, 2178.

*United States v. McIntyre,* 582 F.2d 1221, 1223 (9th Cir.1978).

A person's "reasonable expectation of privacy" is a matter to be considered on a case-by-case basis, taking into consideration its unique facts and circumstances. *Benford v. American Broadcasting Companies,* 502 F.Supp. 1159, 1162 (D.Md.1980). Generally, the test applied is two part: (1) Did the person involved have a subjective expectation of privacy; and (2) Was that expectation objectively reasonable? *United States v. McIntyre,* 582 F.2d at 1223.

In this case and for the purpose of this decision only, both parts of the inquiry must be answered in the affirmative. The plaintiff met in a private home with a select group of individuals who had represented, albeit falsely, they were interested in purchasing insurance. The plaintiff did not personally expect, nor did he intend, for his remarks to be intercepted, partly for broadcast to the American public on national television. Certainly, no reasonable person entering a private home to sell insurance under similar circumstances would have anticipated his conversation would be electronically monitored. The plaintiff, therefore, did partake in an "oral communica-

tion", 18 U.S.C. § 2510(2), a term whose meaning this Court finds was "clearly established" within the context of *Harlow,* in November, 1978. *See Benford v. American Broadcasting Companies,* 502 F.Supp. 1159, 1162 (D.Md.1980). *Cf. Procunier Navarette, supra.*[8]

For these reasons, this Court rejects the congressional defendants' position that Title III of the Omnibus Crime Control and Safe Streets Act, 18 U.S.C. § 2510(2), is vague and fails to comport with the "clearly established" standard of *Harlow.* The congressional defendants' request for qualified immunity as to Count IV of plaintiff's complaint on the basis of *Harlow* will therefore be denied.

### III.

### THE DOCTRINE OF QUALIFIED IMMUNITY—SCOPE OF AUTHORITY

This Court, having determined the congressional defendants cannot successfully raise the defense of qualified immunity as to plaintiff's claims under the Maryland Act and The Federal Eavesdropping Statute because they did not meet the objective good faith standard under *Harlow,* must now determine whether these same defendants acted within the scope of their authority in November, 1978. This question must be addressed in order to determine the viability of the qualified immunity defense with regard to the common law counts. If the congressional defendants acted within the scope of their authority, their summary judgment motion against plaintiff's common law counts will be granted under *Butz v. Economou, supra,* and *Barr v. Matteo, supra.* If not, their qualified immunity defense will be denied.

To make out a defense that he acted within the outer perimeter of his scope

8. The congressional defendants have offered no authority, nor is this Court aware of any, wherein Section 2510(2) was found to be unreasonably vague or unclear. *See e.g. United States v. McIntyre,* 582 F.2d 1221 (9th Cir. 1978); *United States v. Pui Kan Lam,* 483 F.2d 1202 (2d Cir.), *cert. denied* 415 U.S. 984, 94 S.Ct. 1578, 39 L.Ed.2d 881 (1973).

been violated. Because this Memorandum addresses the question of qualified immunity only, these defenses and all others which do not concern the *Harlow* "objective good faith" standard and the "scope of authority" issue, will not be herein considered.

of authority, an official must show his authorization was founded in the law. *Cunningham v. Macon and Brunswick R. Co.,* 109 U.S. 446, 452, 3 S.Ct. 292, 297, 27 L.Ed. 992 (1883). However, it is not enough that an official's immediate supervisor approved his actions when the supervisor himself lacked authority to sanction the unlawful event:

> For example, *Little v. Barreme,* 2 Cranch 170, 2 L.Ed. 243 (1804), held the commander of an American warship liable in damages for the seizure of a Danish cargo ship on the high seas. Congress had directed the President to intercept vessels reasonably suspected of being en route *to* a French port, but the President had authorized the seizure of suspected vessels whether going *to* or *from* French ports, and the Danish vessel seized was en route *from* a forbidden destination. The Court, speaking through Mr. Chief Justice Marshall, held that the President's instructions could not "change the nature of the transaction, or legalize an act which, without those instructions, would have been a plain trespass." *Id.,* at 179, 2 L.Ed. 243 . . .

> *Bates v. Clark,* 95 U.S. 204, 24 L.Ed. 471 (1877), was a similar case. The relevant statute directed seizures of alcoholic beverages in Indian country, but the seizure at issue, which was made upon the orders of a superior, was not made in Indian country. The "objection fatal to all this class of defenses is that in that locality (the seizing officers) were utterly without any authority in the premises" and hence were answerable in damages. *Id.,* at 209, 24 L.Ed. 471 . . .

In both *Barreme* and *Bates,* the officers did not merely mistakenly conclude that the circumstances warranted a particular seizure, but failed to observe the limitations on their category or type of seizures they were authorized to make.

*Butz v. Economou,* 438 U.S. at 490–91, 98 S.Ct. at 2903 (1978); *See also Busche v. Burkee,* 649 F.2d 509 (7th Cir.) *cert. denied,* 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981) ("We reject this broad conclusion (that the defendant is not liable) to the extent it may imply that an individual is relieved of personal responsibility for perpetrating unlawful acts against another simply because he is acting as an agent or subject to a superior's orders.") [9]

■ Once it is shown the supervisor possessed the legal authority to order his subordinates to act, the remaining hurdle is a showing that the order was in fact given. In this case, the congressional defendants operated under the auspices of the House Select Committee on Aging, whose chairman was, and remains, Congressman Claude D. Pepper (D.Fla.). Although the congressional defendants have submitted much documentation which would indicate the final results of their investigation were well received by Congressman Pepper and other members of the United States House of Representatives,[10] there is still no record evidence to indicate any individual member of Congress or staff member of the Select Committee possessed the actual power to arrange and/or authorize the public broadcasting of the plaintiff's November 3, 1978, meeting.[11] Nor is this Court aware of a House resolution or Court order which

---

**9.** This rule makes commonly good sense. One can imagine the consequences were a high ranking official permitted to act as a "straw man" who could broaden the scope of his own authority simply by ordering his subordinates to carry out those tasks he is not permitted to accomplish personally.

**10.** The investigation was far-reaching in scope and involved an exhaustive examination and review of the practices of the insurance industry and its impact on the elderly. The plaintiff was only one of dozens of sales people whose

tactics were studied. The methods the committee used to investigate varied depending on the circumstances.

**11.** The congressional defendants suggest their agreement with defendant ABC which resulted in the broadcasting of plaintiff's meeting was directly authorized by Congressman Pepper. This Court need not reach that issue, however, as the threshold question is whether he had the power to do so. Clearly, he did not.

granted the congressional defendants power to broadcast, with ABC, the plaintiff's November 3, 1978 meeting. In the absence of any proof that this authority existed by law, this Court has no choice but to find the congressional defendants' public broadcasting of the plaintiff's meeting was beyond the province of the Select Committee and therefore beyond their permissible scope of authority.[12] *See McSurley v. McClellan,* 553 F.2d 1277, 1285 (D.C.Cir.1976) (*en banc*) ("To the extent plaintiffs charge dissemination outside the Halls of Congress, the federal defendants are not immune to further questioning."); *Cf. Gravel v. United States,* 408 U.S. 606, 620, 92 S.Ct. 2614, 2625, 33 L.Ed.2d 583 (1972) (The Supreme Court has taken "a decidedly jaundiced view towards extending the (Speech and Debate) Clause so as to privilege illegal or unconstitutional conduct beyond that essential to foreclose executive control of legislative speech or debate and associated matters such as voting and committee reports and proceedings.") [13]

Therefore, because the public broadcasting of plaintiff's November 3, 1978 meeting was properly and adequately alleged tortious interference with plaintiff's business relations and privacy, the broadcast being part of an allegedly unlawful conspiracy, and there being no record evidence to show this broadcast was legitimately authorized by Congress or was part of the deliberative or legislative process; this Court finds that the congressional defendants acted beyond their scope of authority in its making. The congressional defendants are consequently not immune to plaintiff's common law counts.

**12.** This Court has already decided, *inter alia:*
(T)he publication of the taped meeting of November 3 was not "an integral part of the deliberative and communicative processes" of the Select Committee.
*Benford v. American Broadcasting Companies,* 502 F.Supp. 1148, 1154 (D.Md.1980).

**13.** The congressional defendants' agreement that they are entitled to qualified immunity solely because their activities were "official" functions, as opposed to legislative functions, is

## IV.

## CONCLUSION

In conclusion, this Court holds that the congressional defendants are not officially immune to Counts I, II, III, V, and VI of plaintiff's complaint. The Maryland Act and the Federal Eavesdropping Statute were clearly established and would have been known to a reasonable person at the time the defendants surreptitiously taped and broadcast plaintiff's November 3, 1978 meeting. Moreover, the congressional defendants have failed to adequately demonstrate that they acted within the scope of their authority in the broadcasting of excerpts of that meeting on national television, said broadcast being well beyond the legislative function.

Accordingly, the congressional defendants request for summary judgment based on qualified immunity is denied, without prejudice to the remaining grounds for dismissal and/or summary judgment which have been alleged and which have not yet been decided; and the stay of discovery as to the congressional defendants, ordered by this Court on July 16, 1982, is hereby lifted.

A separate Order will be entered to effectuate the rulings of this opinion.

not well taken. This Court has already stated that though it
"does not question the value of the 'informing function' of Congress, (there appears to be) no legitimate reason for using it as a means of protecting the publication of materials injurious to private individuals."
*Benford v. American Broadcasting Companies, Inc.,* 502 F.Supp. 1148, 1155 (D.Md.1980). *See also: Hutchinson v. Proxmire,* 443 U.S. 111, 99 S.Ct. 2675, 61 L.Ed.2d 411 (1979).